SCRIPPS CLINIC AND RESEARCH FOUNDATION, and Revlon, Inc., Plaintiffs and, Counterdefendants,

v.

GENENTECH, INC. and Miles Laboratories, Inc., Defendants.

No. C–83–5423–WWS.

United States District Court, N.D. California.

July 20, 1987.

---

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., and Eugene Moroz and William S. Feiler, Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiffs and counterdefendants.

Bradford J. Duft, James W. Geriak and Douglas E. Olson, Lyon & Lyon, Los Angeles, Cal., Richard Haas and Janet Morgan, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Bertram Bradley and James A. Giblin, Berkeley, Cal., and Arnold Sprung and Nathaniel D. Kramer, Sprung, Horn, Kramer & Woods, New York City, for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1382 |
| II. | Factual Background | 1383 |
| III. | The Claims at Issue | 1385 |
| IV. | Infringement | 1386 |
| | A. General Principles | 1386 |
| | B. The Product-by-Process Claims | 1386 |
| | 1. Claim Interpretation | 1386 |
| | 2. Infringement | 1387 |
| | a. Tuddenham Human Factor VIII:C | 1388 |
| | b. Plasma-derived Factor VIII:C | 1388 |
| | Produced by Genentech | |

| | | |
|---|---|---|
| c. | Recombinant Factor VIII:C Produced by Genentech | 1388 |
| d. | Doctrine of Equivalents | 1388 |
| e. | Summary | 1389 |
| C. | The Product Claims | 1389 |
| 1. | Claim Interpretation | 1389 |
| 2. | Infringement | 1390 |
| a. | Plasma-derived Factor VIII:C Produced by Genentech | 1390 |
| b. | Recombinant Factor VIII:C Produced by Genentech | 1391 |
| i. | The Scope of the Product Claims | 1391 |
| (1) | The Structure and Function of Recombinant Factor VIII:C | 1391 |
| (2) | Genentech's Statements | 1392 |
| (3) | Genentech's Response | 1393 |
| ii. | Claims Limitations | 1394 |
| iii. | Summary | 1395 |
| V. | Inducement to Infringe | 1395 |
| VI. | Non-Infringement Under 35 U.S.C. § 271(e)(1) | 1395 |
| VII. | Inequitable Conduct | 1397 |
| A. | Background | 1397 |
| B. | Materiality | 1397 |
| 1. | Insufficient Disclosure in the Abstract | 1399 |
| 2. | Cumulative Information | 1399 |
| VIII. | Preliminary Injunction | 1400 |
| IX. | Order | 1401 |

## I. *Introduction*

This action alleges infringement of a patent covering a protein known as Factor VIII:C which plays an essential part in blood clotting. Hemophiliacs commonly suffer from an absence or deficiency of this protein and as a result are exposed to the risk of hemorrhaging from even a minor wound. The patent at issue claims highly concentrated and purified Factor VIII:C and a process for deriving it from human blood plasma. The principal issue raised is whether defendant Genentech, Inc.'s production of Factor VIII:C using recombinant technology infringes plaintiffs' patent.

Plaintiffs are Scripps Clinic and Research Foundation (Scripps), the owner of the relevant patents, and Revlon, Inc., the exclusive licensee.[1] They filed this action against Genentech for infringement of United States Patent No. 4,361,509 (the '509 patent) in November 1983.[2] Genentech answered and cross-complained, alleging invalidity and unenforceability. The action was stayed pending Scripps's application for a reissue patent. A companion action, *Scripps Clinic and Research Foundation v. Chiron Corporation*, No. C–83–5424–WWS, was also stayed pending decision of this case. Genentech and several other competing biotechnology firms contested Scripps's reissue application before the Patent and Trademark Office (PTO). The PTO rejected several of Scripps's new claims and required amendments of others, but finally issued Reissue Patent No. RE 32,011 (the '011 patent) on October 22, 1985.

The parties then resumed this litigation and conducted limited discovery. On August 1, 1986 the Court denied as premature

---

**1.** In 1986 Revlon sold its interest to Rorer Group, Inc., which has since been added as a plaintiff.

**2.** By motion granted March 6, 1987, Miles Laboratory, Inc., of which Cutter Laboratories is a division, was added as a defendant.

Genentech's motion for dismissal or summary judgment under 35 U.S.C. § 271(e)(1) and ordered Scripps to submit an offer of proof specifying each act alleged to be an infringement. Scripps filed its offer of proof on September 29, 1986. In October 1986, Scripps moved for a preliminary injunction and for summary judgment of infringement. In January 1987, Genentech filed motions to dismiss or for summary judgment of non-infringement and unenforceability. On March 6, 1987 the Court conducted a hearing on the motions, following which the parties filed supplemental papers and responded to the Court's request for additional information. The Court also received and has considered two declarations submitted in this action by Chiron Corporation.

The following motions are presently before the Court for decision:

(1) Scripps's motion for partial summary judgment on the issue of Genentech's infringement of the specified claims by Genentech's manufacture, use and sale of Factor VIII:C and Genentech's inducement of Cutter to make Factor VIII:C.

(2) Scripps's motion for a preliminary injunction enjoining Genentech from making, using or selling Factor VIII:C and from inducing Cutter to infringe the patent claims.

(3) Genentech's motion under 35 U.S.C. § 271(e)(1) to dismiss or for summary judgment.

(4) Genentech's motion for summary judgment of unenforceability on the ground that the patent was obtained through inequitable conduct.

(5) Scripps's counter-motion for summary judgment that the patent is not unenforceable on inequitable conduct grounds.

II. *Factual Background*

The following facts are undisputed.

Blood clotting, although not fully understood, may be generally described as follows. The clotting process begins when platelets in the bloodstream adhere to the site of a wound. The platelets would be dislodged, however, unless bound in place by strands of fibrin, an insoluble polymer.

The formation of a network of fibrin from its soluble precursor, fibrinogen, is critical to clotting. That formation is the result of a complex series of interactions between blood proteins. Factor VIII:C is one of the agents that activate other proteins essential to this process. A deficiency in Factor VIII:C therefore prevents blood clotting.

Two Scripps scientists, Drs. Zimmerman and Fulcher, developed a process for purifying and concentrating Factor VIII:C from human and porcine blood plasma. On November 30, 1982 Scripps was issued the '509 patent claiming both the process and the product of that process, "highly purified and concentrated VIII:C." Reissue patent '011, issued October 22, 1985, added claims for human Factor VIII:C preparations with specific characteristics relating to purity and concentration.

Factor VIII:C travels in the blood stream attached to a similar protein, Factor VIII:RP, also known as von Willebrand Factor. Under the Scripps patent Factor VIII:C is obtained by pouring large quantities of human or porcine blood plasma over monoclonal antibodies to Factor VIII:RP which have been attached to a solid surface, such as small beads. Factor VIII:RP, still attached to the Factor VIII:C in the plasma, binds to these antibodies, while other particles in the plasma pass through the beads. This step of the process separates substantially pure VIII:C/VIII:RP complexes from the plasma. It is claimed to be a significant innovation over less successful techniques using either polyclonal antibodies or monoclonal antibodies to Factor VIII:C.

In the next step, the VIII:C/VIII:RP complexes are washed with a salt solution, which breaks the bonds between the Factor VIII:C and Factor VIII:RP and elutes the Factor VIII:C, leaving the Factor VIII:RP still bound to the antibodies. In the final step of the process, the Factor VIII:C is filtered through another adsorption to concentrate and purify it further.

Although the amino acid sequences of human and porcine plasma differ, Factor VIII:C derived from either human or porcine plasma will clot human blood. Factor

VIII:C has also been isolated from bovine plasma but produces adverse side effects when administered to humans. Hence, the presently known plasma sources for Factor VIII:C are limited. Because Factor VIII:C exists in only minute quantities in blood, its recovery from plasma requires a large donor pool. As a result, concentrated Factor VIII:C from human sources is expensive to produce. Moreover, there is evidence (though disputed) that Factor VIII:C derived from human sources could carry impurities, including infectious agents, from the blood of donors.

Defendant Genentech researches and develops biotechnology. In 1981 a team of Genentech scientists led by Dr. Vehar began research into producing human Factor VIII:C through recombinant technology, which would obviate the need for a large pool of donors and eliminate the risk of transmitting infectious agents from donors.

In the human body, Factor VIII:C is produced by a gene in cells of the liver, kidneys, spleen and lymph glands and is then secreted into the bloodstream. The gene contains a stretch of DNA, which in turn is composed of a chain of nucleotides. Each nucleotide carries one of four bases (adenine, thymine, guanine and cytosine). The sequence of bases governs the production and sequence of amino acids composing a protein such as Factor VIII:C. Thus, to produce Factor VIII:C by recombinant technology, it was necessary first to identify the stretch of DNA responsible for Factor VIII:C and then to clone it.

Because Factor VIII:C, now known to consist of a chain of 2,332 amino acids when in the bloodstream, is a much larger protein than any previously produced through recombinant technology, Genentech had to break new ground. It began by determining the sequence of amino acids in segments of human Factor VIII:C from samples manufactured from blood plasma both by Dr. Tuddenham of Speywood Laboratories in England and by Genentech itself. Genentech then used the genetic in-

formation so acquired to translate the amino acid sequence of a short link of Factor VIII:C into a complementary strand of DNA. This strand of DNA, called a probe, was inserted into a genomic library containing a complete set of human genes. The probe hybridized, or associated, with a portion of the gene for Factor VIII:C. By repeating this process using the gene segment as a probe, Genentech was able to piece together the entire gene for Factor VIII:C. The gene, found to consist of 186,000 bases, was too large to transplant using the current technology. The coding information for Factor VIII:C, however, is interspersed over less than one-twentieth of the gene. Messenger RNA (mRNA) carries only this essential coding information. Therefore, Genentech used a probe to locate mRNA in a human cell. The mRNA in turn probed a smaller genetic library constructed from a human cell found to be a site of Factor VIII:C production; there the probe hybridized with DNA complementary to mRNA (cDNA). Finally, a complete strand of cDNA containing the essential coding information, inserted in a plasmid,[3] was transplanted into a baby hamster kidney cell. There the gene dictated synthesis of Factor VIII:C much as it would in a human cell. After the hamster cell manufactured the Factor VIII:C, the protein was harvested and purified from the culture. Monoclonal antibodies to Factor VIII:C were used in the purification process.[4]

Genentech first succeeded in manufacturing recombinant Factor VIII:C by this process in April 1984. In December 1984 it entered into a research and development contract with Cutter under which Cutter would develop a method for commercial scale production of recombinant Factor VIII:C and produce bioequivalency data required by the Food and Drug Administration (FDA).

On April 18, 1986 Genentech filed European Patent Application number 85302734.0 claiming "human Factor VIII" and recom-

---

**3.** A plasmid is a circular DNA molecule that replicates in a cell.

**4.** *See generally*, Lawn & Vehar, The Molecular Genetics of Hemophilia, Sci. Am., March 1986, at 48.

binant methods for its production. So far as the record shows, neither Genentech nor Cutter has as yet produced Factor VIII:C in commercial quantities.

### III. *The Claims at Issue*

Claims 13 and 14 common to the '509 and '011 reissue patents and claims 17, 18, 24 through 29 and 34 of the '011 reissue patent are alleged to have been infringed by Genentech.

Those claims are as follows:

13. Highly purified and concentrated human or porcine VIII:C prepared in accordance with the method of claim 1.

14. Highly purified and concentrated human or porcine VIII:C prepared in accordance with the method of claim 6.

17. A VIII:C of claim 13, wherein said VIII:C is human VIII:C.

18. A VIII:C of claim 14, wherein said VIII:C is human VIII:C.

24. A human VIII:C preparation having a potency in the range of 134 to 1172 units per ml. and being substantially free of VIII:RP.

25. A human VIII:C preparation of claim 24, wherein the VIII:C concentration is at least 160,000 fold purified relative to VIII:C in plasma.

26. A human VIII:C preparation of claim 24, wherein the ratio of VIII:C to VIII:RP is greater than 100,000 times the ratio in plasma.

27. A human VIII:C preparation of claim 24, wherein said VIII:C is isolated from VIII:C/VIII:RP and 90–100 percent of the VIII:RP has been removed.

28. A human VIII:C preparation having a specific activity greater than 2240 units/mg.

29. A human VIII:C preparation of claim 28 wherein the potency is in the range of 134 to 1172 units/ml.

34. Highly purified and concentrated human or porcine VIII:C prepared in accordance with the method of claim 30.

Claims 1, 6 and 30, incorporated by reference above, state:

1. An improved method of preparing Factor VIII procoagulant activity protein comprising the steps of

(a) adsorbing a VIII:C/VIII:RP complex from a plasma or commercial concentrate source onto particles bound to a monoclonal antibody specific to VIII:RP,

(b) eluting the VIII:C,

(c) adsorbing the VIII:C obtained in step (b) in another adsorption to concentrate and further purify same,

(d) eluting the adsorbed VIII:C, and

(e) recovering highly purified and concentrated VIII:C.

6. The method according to claim 1, wherein aminohexyl agarose is employed in step (c) as the adsorbent.

30. An improved method of preparing Factor VIII procoagulant activity protein comprising the steps of

(a) adsorbing a VIII:C/VIII:RP complex from a plasma or commercial concentrate source onto a substrate to which is bound a monoclonal antibody specific to VIII:RP,

(b) eluting the VIII:C,

(c) adsorbing the VIII:C obtained in step (b) in another adsorption to concentrate and further purify same,

(d) eluting the adsorbed VIII:C, and

(e) recovering highly purified and concentrated VIII:C.

Claims 13 and 14, the only asserted claims common to both the original '509 patent and the '011 reissue patent, were amended in the '011 patent by addition of the words "human or porcine" before "VIII:C".

The claims in litigation fall into two general categories:

(1) product-by-process claims (claims 13, 14, 17, 18 and 34); and

(2) product claims (claims 24 through 29). Because the legal analysis governing infringement differs in material respects, product-by-process claims and product claims will be discussed separately in Part IV of this opinion. The remainder of the opinion will address issues equally applicable to both categories.

## IV. *Infringement*

### A. *General Principles*

Infringement occurs whenever a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor ..." 35 U.S.C. § 271(a). "The patentee bears the burden of proving infringement by a preponderance of the evidence." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed.Cir.1985). A determination of infringement requires two steps: "first, the scope of the claims must be ascertained, and then the trier must decide whether the claims cover the accused device." *P.M. Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). "Infringement raises the legal issue of claim construction and the factual issue of whether the accused device infringes properly interpreted claims." *Martin v. Barber*, 755 F.2d 1564, 1566 (Fed.Cir.1985). *See also Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *Matsushita*, 775 F.2d at 1116 and 1118.

A claim is construed in light of the claim language, the other claims, the prior art, the prosecution history, and the specification. *Id.*, 775 F.2d at 1118. In addition, claims are normally interpreted as they would be by those of ordinary skill in the art. *Palumbo*, 762 F.2d at 975. A dispute over claim construction does not preclude summary judgment in the absence of material evidentiary disputes. *Martin*, 755 F.2d at 1567.

Once the claims have been construed, they must be applied to the accused device to determine infringement. *Matsushita*, 775 F.2d at 1118. The court may find literal infringement if the accused device falls within the scope of the asserted claims as properly interpreted. *Palumbo*, 762 F.2d at 974. Infringement presents a question of fact, but, under Fed.R.Civ.P. 56, summary judgment is "appropriate, in a patent as in any other case, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Matsushita*, 775 F.2d at 1116. *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The district court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *Matsushita*, 775 F.2d at 1116; *Martin v. Barber*, 755 F.2d at 1566. The burden is on the nonmoving party, however, to identify a material evidentiary conflict in the record. "Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *Matsushita*, 775 F.2d at 1116. Moreover, "[t]he *materiality* of facts is viewed in light of the legal standard to be applied in the case." *Barmag*, 731 F.2d at 836 (emphasis in original); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *The Product-by-Process Claims*

#### 1. *Claim Interpretation*

Claims 13, 14, 17, 18 and 34 are product-by-process claims. A product may be defined by the process of making it if the English language is inadequate to describe the invention. "However, the invention so defined is a *product* and not a *process.*" *In re Bridgeford*, 357 F.2d 679, 682 (C.C.P.A.1966) (emphasis added).

The question whether a product-by-process claim is infringed is not to be confused with the question whether it is patentable. An original process to manufacture a product already in the prior art may not be used to patent that product by means of a product-by-process claim. Although the new *process* may be patentable under a process claim, the *product itself* is not patentable because it is unoriginal. In that case the product-by-process claim is not patentable because it claims the product and not the process. *See In re Thorpe*, 777 F.2d 695, 697 (Fed.Cir.1985) ("The patentability of a product does not depend on its method of production").

It does not follow, however, that once a product-by-process patent issues, it is infringed by any product that would infringe a product claim, as Scripps argues. A product-by-process claim is infringed only

by a product produced by following the same process described in the claim. The Supreme Court held a product-by-process claim uninfringed in *Cochrane v. Badische Anilin & Soda Fabrik*, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433 (1884) because the defendants had not been shown to follow the process describing the product. The plaintiff argued that the accused product was "physically, chemically, and in [functional] properties similar" to the patented product. *Id.* at 310, 4 S.Ct. at 464. According to the Court, however, the patent defined the product only as the product of the described process. "Therefore, unless it is shown that the process of [the patent] was followed to produce the defendants' article, or unless it is shown that that article could not be produced by any other process, the defendants' article cannot be identified as the product of the process of [the patent]." *Id.*

Two Courts of Appeals have reached the same conclusion. The Third Circuit has held that "[a] patent granted on a product claim describing one process grants no monopoly as to identical products manufactured by a different process." *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 876 (3d Cir.1977). Similarly, the Seventh Circuit has stated that "a claim [patenting a] product [may] define it as the product resulting from a described process and, if the character of the product depends upon the manner in which it has been produced, ordinarily, it should be claimed only as the thing produced by the specific process." *National Carbon Co. v. Western Shade Cloth Co.*, 93 F.2d 94, 96 (7th Cir.1937), *cert. denied*, 304 U.S. 570, 58 S.Ct. 1039, 82 L.Ed. 1535 (1938). *See also* 2 D. Chisum, PATENTS § 8.05, 8–67 (1986) ("Most decisions hold that [a product-by-process] claim is infringed only by a product made through a substantially identical process . . .").

Scripps contends that two Court of Customs and Patent Appeals cases "indicate" that court's disagreement with federal cases construing product-by-process claims as limited to products produced by the disclosed process. Both cases cited, *In re Bridgeford*, 357 F.2d 679 (C.C.P.A.1966)

and *In re Hirao*, 535 F.2d 67 (C.C.P.A. 1976), involved appeals from the denial of patent claims by the PTO Board of Appeals. Neither expressed disapproval of construing product-by-process claims, in the context of *infringement suits*, as describing only a product made by the specified process. The court acknowledged in *In re Bridgeford* that, while a product-by-process claim describes a *product*,

> [t]he policy of the Patent Office in permitting product-by-process type claims to define a patentable product, where necessary, has developed with full cognizance of the fact that in infringement suits some courts have construed such claims as covering only a *product made by the particular process* set forth in the claim and not to the product per se.

357 F.2d at 682 n. 5 (emphasis in original). Similarly, in a footnote in *In re Hirao*, the court remarked on the distinction between the standard for patentability of a pure process claim and the standard for infringement of a product-by-process claim. 535 F.2d at 69 n. 3. Neither of these decisions, nor any others of which the Court is aware, support Scripps's contention.

Accordingly, to prove infringement of the product-by-process claims, Scripps must show by a preponderance of the evidence that the accused product was the result of following the processes described in the claims or that the accused product could not have been the result of any other process. *See Cochrane*, 111 U.S. at 310, 4 S.Ct. at 464.

### 2. Infringement

#### a. Tuddenham Human Factor VIII:C

■ Scripps contends that Genentech infringed by using human plasma-derived Factor VIII:C produced by Dr. Tuddenham of Speywood Laboratories in England. Genentech used the Tuddenham Factor VIII:C to determine the protein content, amino acid sequence, structure and functional properties of human Factor VIII:C.

The record reveals, however, that Genentech's entire supply of Tuddenham Factor

VIII:C was received and used between 1982 and 1984, prior to reissue of Scripps's '011 patent in October 1985. Because product-by-process claims 13 and 14 were the sole asserted claims in force prior to 1985, the Tuddenham Factor VIII:C literally infringed Scripps's patent only if it was prepared using the processes described in those claims.

The record contains uncontroverted evidence that the Tuddenham Factor VIII:C was made using the identical process described in claim 1 and incorporated by reference in claim 13. Dr. Tuddenham first purified a commercial concentrate through monoclonal antibodies to Factor VIII:RP. The Factor VIII:C was eluted, adsorbed in an adsorption of monoclonals to Factor VIII:C, and then eluted again. Vehar depo., at 78–79. The end product was highly purified and concentrated human Factor VIII:C, as defined in the claims, with specific activities greater than 2240 u/mg and potencies in the range of 134–1172 u/ml. Offer of Proof (O.P.) at 12–13 and Ex. 3. Genentech's use of the Tuddenham Factor VIII:C thus infringed claim 13. 35 U.S.C. § 271(a).[5]

Scripps concedes that Dr. Tuddenham did not make use of a second adsorption of aminohexyl agarose as described in claim 6 and incorporated in claim 14. Hence, the Tuddenham Factor VIII:C did not infringe claim 14.

### b. *Plasma-derived Factor VIII:C Produced by Genentech*

Scripps concedes that the Factor VIII:C produced by Genentech from human plasma was obtained using monoclonal antibodies to *Factor VIII:C,* not Factor VIII:RP. There is no evidence, therefore, that plasma-derived Factor VIII:C manufactured by Genentech infringed the product-by-process claims.

### c. *Recombinant Factor VIII:C Produced by Genentech*

In producing Factor VIII:C using recombinant processes, Genentech obviously used processes other than those disclosed in the product-by-process claims.

### d. *Doctrine of Equivalents*

■ Scripps contends that even if the Tuddenham Factor VIII:C and the plasma-derived and recombinant Factor VIII:C manufactured by Genentech did not literally infringe all the product-by-process claims, they nonetheless infringed the claims under the doctrine of equivalents.

The doctrine of equivalents was "designed to protect a patentee from an infringer who appropriates the invention but avoids the literal language of the claims." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co,* 750 F.2d 1569, 1579 (Fed.Cir. 1984). The doctrine recognizes that although an accused product does not literally infringe a patented product, it may in fact be "substantially the same thing, used in substantially the same way, to achieve substantially the same result," and so infringe. *Matsushita,* 775 F.2d at 1123. The doctrine was "judicially devised to do equity," *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983), and applies only if literal infringement is not found, *Loctite Corp. v. Ultraseal,* 781 F.2d 861, 870 (Fed.Cir.1985).

Scripps has successfully proved that the Tuddenham Factor VIII:C literally infringed claim 13 of the patent. Furthermore, as discussed in succeeding sections, the Factor VIII:C manufactured by Genentech both from plasma and recombinantly literally infringed product claims in the patent. *See infra* at 1390–1395. Genentech has thus not avoided the literal language of the patent while appropriating the invention; rather, it has directly infringed claims of the patent. Therefore, Scripps is not entitled to the equitable application of the doctrine of equivalents.

In any event, Scripps's contention that the accused Factor VIII:C infringed the

---

**5.** Genentech claims that the Tuddenham Factor VIII:C was frozen by Dr. Tuddenham before being transported to the United States, and hence arrived in a "denatured" and noninfring-ing state. There is no evidence, however, that the Tuddenham Factor VIII:C was not highly purified and concentrated, albeit in a denatured state, when it was used by Genentech.

product-by-process claims under the doctrine of equivalents, even though it was not produced according to every step in those claims, is merely an attempt to evade the limitation inherent in claiming the product of a process. Application of the doctrine of equivalents in this context would render meaningless the necessity of establishing infringement of a product-by-process claim by demonstrating that "the process of [the patent] was followed to produce the defendants' article, or ... that the article could not be produced by any other process." *Cochrane*, 111 U.S. at 310, 4 S.Ct. at 464. Scripps is therefore not entitled to application of the doctrine of equivalents in this context as a matter of law.

### e. *Summary*

The undisputed facts establish Genentech's infringement of claim 13 by its use of the Tuddenham Factor VIII:C, and Scripps's motion must be granted on that claim. In all other respects, Scripps's motion based on infringement of the product-by-process claims is denied.

## C. *The Product Claims*

### 1. *Claim Interpretation*

■ Scripps also alleges infringement of product claims 24 through 29 covering concentrated preparations of "human Factor VIII:C." According to Scripps, these claims cover preparations, in the specified ranges of purity and potency, of Factor VIII:C with the functional and structural characteristics of the protein as it occurs naturally in humans.[6] Genentech, on the other hand, argues that Scripps's claims are limited to Factor VIII:C derived from human blood plasma. The issue posed is whether the asserted product claims must be interpreted to apply solely to concentrates of Factor VIII:C derived directly from human blood plasma or whether they extend also to other concentrates of Factor VIII:C having the same characteristics as those derived from human blood plasma.

"A claim is construed in light of the claim language, the other claims, ... and the specification." *Matsushita*, 775 at 1118. Claims 24 through 29 each claim a "human VIII:C preparation," but do not specify whether the VIII:C must be derived directly from the bloodstream. In contrast, the patent's process and product-by-process claims all incorporate the limitation that the Factor VIII:C is filtered "from a plasma or commercial concentrate source." Genentech would have the Court read this limitation into claims 24 through 29 as well. The law, however, is clear that "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining ... infringement." *Matsushita*, 775 F.2d at 1122. Claims 24 through 29 cannot be read as limited to Factor VIII:C recovered directly from human plasma. Rather, they claim preparations of the disclosed purity or concentration having characteristics specific to Factor VIII:C found in humans.

Genentech also points out that the preferred embodiment described in the specification discloses a process for filtering Factor VIII:C from human or porcine plasma and urges the Court to read this limitation into the claims. This argument is "legally unsound." *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 699 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). "The specification must be sufficiently explicit and complete to enable one skilled in the art to practice the invention, while a claim defines only that which the patentee regards as his invention ... The claim, not the specification, measures the invention ..." *Id.* The law

does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention. The law recognizes that

---

**6.** There is no dispute over the patentability of a Factor VIII:C preparation. Although Factor VIII:C molecules occur in nature, a purified and concentrated preparation of Factor VIII:C as claimed in the patent constitutes a new form or combination not existing in nature, and hence is patentable under 35 U.S.C. § 101. *See Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948); *In re Bergstrom*, 427 F.2d 1394, 1401 (C.C.P.A.1970).

patent specifications are written for those *skilled in the art,* and requires only that the inventor describe the "best mode" known at the time to him of making and using the invention.

*Matsushita,* 775 F.2d at 1121 (emphasis in original). Scripps is entitled to claim purified Factor VIII:C having the characteristics of human Factor VIII:C, whether derived through its disclosed process or any other process achieving the same result.

Interpretation of claim language is also aided by reference to the prosecution history and prior art. *Matsushita,* 775 F.2d at 1118. During the prosecution of its reissue patent, Scripps distinguished the prior art contained in an article by Dr. Vehar on the ground that Dr. Vehar's work involved only bovine plasma, "whereas all of [Scripps's) claims, except 13, 14 and 40 [three claims that did not specify the source of the Factor VIII:C], are literally specific to human VIII:C." Scripps enumerated the following differences between bovine and human Factor VIII:C:

> The difference in species is particularly important both from a scientific and therapeutic point of view. Vehar reports a triplet in gel electrophoresis, which differs from the gel pattern reported by applicants. The molecular weights reported for bovine VIII:C are also quite different from those of human VIII:C....
>
> The bovine VIII:RP/VIII:C complex is quite different from the human VIII:RP/VIII:C complex. The bovine complex is very difficult to disassociate ...
>
> ... Lavergne ... summarized some of the differences between various species VIII including bovine and human. These reported differences include: carbohydrate content: Human 6%, Bovine 20%; bovine induces direct aggregation of human platelets without ristocetin. Specific antisera raised against purified human and non-human Factor VIII show a poor degree of cross-reactivity which is indicative of distinct antigenic structure. Humans treated with bovine VIII:C develop antibodies to it.... [T]here is a difference of a factor of 20 times between

bovine and human antibody inhibition of human Factor VIII and a difference in respective thrombin activity ...

> The species difference and the resulting differences in amino acid sequences, antigenicity and efficacy in therapeutic use show they are different.

Reissue File History at 00216–18. The examiner was persuaded "that animal VIII:C is not the equivalent of Human VIII:C ..." *Id.* at 00231.

The prosecution history thus makes clear that both Scripps and the examiner considered the term "human VIII:C" to be descriptive not of its derivation from human plasma but of its fundamental characteristics peculiar to the species. Such characteristics as amino acid sequence, antigenicity, and efficacy in therapeutic use distinguish the Factor VIII:C of different species. The excerpts quoted by Genentech from deposition testimony of Drs. Katzmann and Zimmerman, Scripps's experts, that "human" means "obtained from human blood," are not probative on the issue of interpreting the claims. Dr. Katzmann's answer related to Factor V, not Factor VIII, and Dr. Zimmerman's answer did not purport to give an interpretation of the particular claim language. Human Factor VIII:C as claimed in the patent therefore applies to any Factor VIII:C preparation, regardless of how produced, having the same material structural and functional characteristics as the plasma-derived preparation.

### 2. *Infringement*

#### a. *Plasma-derived Factor VIII:C Produced by Genentech*

▮ Genentech does not dispute that after October 22, 1985, when the '011 patent issued, it sold to Cutter purified Factor VIII:C produced by it from human plasma and having characteristics relating to potency and purity claimed in Scripps's product claims.

Claim 24 claims a "human VIII:C preparation having a potency in the range of 134 to 1172 units per ml. and being substantially free of VIII:RP." The record contains

uncontradicted evidence that Genentech produced preparations of human Factor VIII:C from human plasma with potencies in the range of 134 to 1172 units/ml. which were substantially pure of Factor VIII:RP. O.P. at 15, Exs. 12 and 14, Scripps's letter of May 19, 1987.[7] These preparations read on each element of claim 24 and hence infringed that claim.

Claim 24 is incorporated by reference in claims 25, 26 and 27. Claim 25 further requires that the preparation be "at least 160,000 fold purified relative to VIII:C in plasma." There is undisputed evidence that Genentech produced Factor VIII:C preparations with fold purifications and potencies in the claimed ranges, and hence infringed claim 25. *Id.*

Claims 26 and 27, in addition to incorporating claim 24, also require, respectively, that the ratio of Factor VIII:C to Factor VIII:RP be greater than 100,000 times the ratio in plasma and that 90–100 percent of the Factor VIII:RP be removed. Scripps has offered no evidence on these elements of claims 26 and 27 and therefore is not entitled to judgment on these claims.

Claim 28 claims a "human VIII:C preparation having a specific activity greater than 2240 units/mg." The undisputed evidence establishes that Genentech's Factor VIII:C preparations met this requirement as well, *id.*, and therefore infringed claim 28.

Finally, claim 29 claims a preparation of Factor VIII:C of claim 28 with a potency in the range of 134 to 1172 units per ml. This claim was also infringed by Genentech's plasma-derived Factor VIII:C.

The undisputed facts therefore establish that Genentech's plasma-derived Factor VIII:C infringed claims 24, 25, 28 and 29.

b. *Recombinant Factor VIII:C Produced by Genentech*

 The Court has interpreted the claim language "human VIII:C" as not limited to Factor VIII:C produced from human blood plasma. *Supra* at 1389–1390. The remaining issue is whether Factor VIII:C

produced by recombinant processes infringes the product claims so interpreted. To resolve that issue two subsidiary questions must be answered:

 i. Does recombinant Factor VIII:C fall within the scope of the product claims?

 ii. If so, does it conform to the claims limitations?

---

i. *The Scope of the Product Claims*

(1) *The Structure and Functions of Recombinant Factor VIII:C.*

In *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950), the Supreme Court set forth the test for infringement:

> [I]n determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

The undisputed physical evidence, confirmed by Genentech's own consistent statements, establishes that Factor VIII:C produced by recombinant processes falls clearly within the product claims as here interpreted.

The production of Genentech's recombinant Factor VIII:C, although it takes place in hamster rather than human cells, is directed by the controlling human gene. *See supra* at 1384–1385. That gene, transplanted from a human cell to a hamster cell, determines the amino acid sequence and other fundamental structural traits and functions of the protein. Genentech researchers have described the process in the following technical terms: "cloned full-length factor VIII protein coding sequences assembled into a plasmid direct the synthesis of biologically active factor VIII when transfected into cultured mammalian cells." Wood, Capon, Simonsen, Eaton, Gitschier, Keyt, Seeburg, Smith, Hollingshead, Wion, Delwart, Tuddenham, Vehar & Lawn, *Expression of active human*

7. *See infra* note 8.

*factor VIII from recombinant DNA clones,* Nature, November 22, 1984, 1984 reprint, at 1 [hereinafter Vehar & Lawn].

In effect, Genentech's process transfers the site of Factor VIII:C production (1) from the human body to the laboratory and (2) from the cells of the human kidneys, liver, spleen and lymph glands to the cells of hamster kidneys. The master plan for Factor VIII:C production, however, remains constant. Human genetic material, extracted from human cells, is responsible for the production of recombinant Factor VIII:C. The same genetic material dictates the structure and function of the protein regardless of the site of the protein's production. That genetic material directs the identical amino acid sequence whether it remains in a human cell or is transplanted to a hamster cell. The testimony of Dr. Zimmerman cited by Genentech, that human VIII:C is "VIII:C purified from humans and containing amino acid sequence unique to humans," is entirely consistent with the conclusion that recombinant Factor VIII:C is "human."

### (2) *Genentech's Statements*

In an article published in *Nature,* Genentech researchers concluded: "We have demonstrated by several criteria that the DNA sequences isolated here encode human factor VIII ... [T]he amino acid sequence derived from factor VIII preparations and the primary structure of the protein predicted by the cloned sequence are *essentially identical.*" Vehar & Lawn, *supra,* at 6 (emphasis added).

In an article published in *Scientific American* in March 1986, after commencement of this action, Genentech's Drs. Lawn and Vehar stated: "Bioengineered factor VIII does clot hemophilic blood. Indeed, it *has been found to be equivalent in every way to the blood-derived protein.*" Lawn & Vehar, *The Molecular Genetics of Hemophilia,* Sci.Am., March 1986, at 52 (emphasis added).

In their presentation to the Fifth International Symposium on Hemophilia Treatment in September 1986, Drs. Lawn and Vehar stated: "The bioengineered factor VIII is *virtually indistinguishable* from the plasma derived factor in both *in vitro* and *in vivo* experiments ..." Address by Lawn, Eaton, Gitschier, Tuddenham, Vehar, Wion and Wood before the Fifth International Symposium on Hemophilia Treatment (Sept.1986) (emphasis added).

Genentech's European Patent Application takes the same position. It describes Genentech's recombinant process as follows:

Thus, the present invention is *based upon the successful use of recombinant DNA technology to produce functional human factor VIII, and in amounts sufficient to prove identification and functionality and to initiate and conduct animal and clinical testing as prerequisites to market approval.* The product, human factor VIII, is suitable for use, in all of its functional forms, in the prophylactic or therapeutic treatment of human beings diagnosed to be deficient in factor VIII coagulant activity. Accordingly, the present invention, in one important aspect, is directed to methods of diagnosing and treating classic hemophilia (or hemophilia A) in human subjects using factor VIII and to suitable pharmaceutical compositions therefor.

The present invention further comprises essentially pure, functional human factor VIII. The product produced herein by genetically engineered appropriate host systems *provides human factor VIII* in therapeutically useful quantities and purities. In addition, the factor VIII hereof is free of the contaminants with which it is ordinarily associated in its non-recombinant cellular environment.

European Patent Application at 7 (emphasis added).

The term "human factor VIII" is defined in the application as

denot[ing] a functional protein capable, *in vivo* or *in vitro*, of correcting human factor VIII deficiencies ... Such factor VIII is produced by recombinant cell culture systems in active form(s) corresponding to factor VIII activity native to human plasma ... The factor VIII protein produced herein is defined by means of determined DNA gene and amino acid

sequencing, by physical characteristics and by biological activity.

*Id.* at 15–16.

The term "functional human factor VIII" is further defined in the application as follows:

> Thus, human factor VIII in functional form, i.e., "functional human factor VIII", is capable of catalyzing the conversion of factor X to Xa in the presence of factor IXa, calcium, and phospholipid, as well as correcting the coagulation defect in plasma derived from hemophilia A affected individuals, and is further classified as "functional human factor VIII" based on immunological properties demonstrating *identity or substantial identity with human plasma factor VIII.*

*Id.* at 17 (emphasis added).

The application lists the functions of recombinant Factor VIII:C as follows:

a) Correction of factor VIII deficient plasma.

b) Activation of factor X to factor Xa in the presence of factor IXa, calcium and phospholipid.

c) Inactivation of the activity observed in a) and b) by antibodies specific for factor VIII.

d) Binding of the activity to an immobilized monoclonal antibody column specific for factor VIII.

e) Activation of the factor VIII activity by thrombin.

f) Binding of the activity to and subsequent elution from immobilized von Willenbrand factor.

*Id.* at 7.

Declarations submitted by experts in the field confirm that the comparison tests performed by Genentech demonstrate identity of recombinant Factor VIII:C with the plasma-derived preparation. *See* Declarations of Drs. Zimmerman and Fulcher; Dr. Hoyer; and Dr. Sadler.

### (3) *Genentech's Response*

In response, Genentech has offered three categories of evidence to demonstrate that recombinant Factor VIII:C does not fall within the scope of these product claims. The question is whether that evidence raises a genuine issue of material fact, precluding summary judgment for Scripps on these claims.

First, Genentech asserts that all recombinant Factor VIII:C molecules, because they are derived from identical genes, are likely to have identical amino acid sequences. Individual molecules of Factor VIII:C in a preparation derived from the plasma of many donors may differ from the species norm in that they may contain slight variations in amino acid sequence. This phenomenon is known as polymorphism.

There is no evidence, however, that this difference is material. Dr. Sadler, the witness on whose testimony Genentech's argument is based, testified that "[b]y definition a polymorphism is a variation in sequence that is not known to influence function ... A polymorphism that influences function is called a mutation, a disease." Sadler Depo. at 26. Dr. Vehar stated in his declaration that "recombinant Factor VIII:C may differ in composition from human Factor VIII:C yet remain functional." Vehar Decl. at 2. Indeed, Genentech claims to be experimenting with recombinant Factor VIII:C manufactured from an abbreviated gene and containing only 1566 amino acids. Presumably, such a protein would be functionally equivalent to Factor VIII:C, but, in any event, it is as yet no more than a speculative possibility and hence immaterial. What the evidence clearly shows is that complete identity of amino acid sequence is not essential to the material structure and functions of human Factor VIII:C. The contention therefore raises no triable issue with respect to infringement.

Second, Genentech contends that preparations of recombinant Factor VIII:C differ materially from preparations of plasma-derived Factor VIII:C in that the latter may contain human viruses, while the former are bound to be free of human infectious agents. *See* European Patent Application at 17. It may be that in this respect Genentech's product is superior to Scripps's. It does not follow, however, that because Genentech's process may be capable of producing superior human Factor VIII:C preparations, those improved preparations fall

outside the claims. The term "human VIII:C" is not a claim limitation excluding Factor VIII:C preparations free of human infectious agents, since such impurities are obviously extrinsic to the claims. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 868 (Fed.Cir.1985). This contention therefore raises no triable issue of fact.

Genentech's final contention is that Scripps has failed to sustain its burden because it has not established that "the glycosylated carbohydrate is the same for human VIII:C and recombinant VIII:C." Opposition to Motion for Summary Judgment at 19. The only evidence offered by Genentech on this point consists of the following statement in Dr. Vehar's declaration:

> Since the type of glycosylation is specified by the nature of the cell, the carbohydrate structure of factor VIII:C produced by non human cells is expected to be different from that of human cells. The carbohydrate composition and pattern of glycosolation may vary between human VIII:C and recombinant VIII:C. There is no evidence that carbohydrates associated with human VIII:C are the same as those associated with recombinant VIII:C. The glycosolated carbohydrates associated with recombinant VIII:C are likely to be different from the glycosolated carbohydrates associated with human VIII:C.

Vehar Decl. at ¶ 8. A similar assertion is found in Genentech's European Patent Application, which states that "the location of and degree of glycosylation may depend on the nature of the host cellular environment." European Patent Application at 16.

It appears to be undisputed that the carbohydrate structure of Factor VIII:C may be affected by the host cell; in that respect Factor VIII:C may differ depending on whether it is derived from human plasma or produced in hamster cells. Moreover, it is also clear that the carbohydrate content of certain *animal* Factor VIII:C (as distinguished from human Factor VIII:C produced in animal host cells), is significantly different from that of human Factor VIII:C. For example, Scripps asserted be-

fore the PTO that the carbohydrate content of the bovine Factor VIII:C produced by Dr. Vehar differed materially from that of human Factor VIII:C. Reissue File History at 00216–18.

There is no evidence, however, that any difference in the carbohydrate content of plasma-derived and recombinant human Factor VIII:C affects the relevant structure or functions of the material. Dr. Vehar, in an article published contemporaneously with his instant declaration, refers to the authors' observation "suggest[ing] that the presence of the highly glycosylated B domain [of Factor VIII:C] has little effect on factor VIII coagulant activity." Eaton, Wood, Eaton, Hass, Hollingshead, Wion, Mather, Lawn, Vehar & Gorman, *Construction and Characterization of an Active Factor VIII Variant Lacking the Central One-Third of the Molecule*, Biochemistry, December 30, 1986, at 8346. His declaration contains no evidence that differences in carbohydrate content affect the functioning of human Factor VIII:C, and, as previously demonstrated, Genentech's consistent position has been that plasma-derived and recombinant Factor VIII:C are identical in all material respects. *See supra* at 1392–1393.

To conclude, Scripps has shown that recombinant Factor VIII:C is structurally and functionally the same as plasma-derived Factor VIII:C. On the motion for summary judgment, Genentech has the burden of coming forward with evidence raising a material issue of fact. *See Proler Steel Corp. v. Luria Bros. & Co.*, 417 F.2d 272, 274 (9th Cir.1969). That evidence, to be material, would have to permit a trier of fact to find that recombinant Factor VIII:C does not qualify as "human VIII:C" within the meaning of the claims. No such facts having been offered, the Court holds as a matter of law that recombinant Factor VIII:C falls within the scope of the asserted product claims. *See Martin v. Barber*, 755 F.2d 1564, 1567 (Fed.Cir.1985).

### ii. *Claims Limitations*

Scripps has produced uncontroverted evidence that Genentech's recombinant Factor

VIII:C had potencies in the range of 134 to 1172 u/ml,[8] fold purifications of at least 160,000, and specific activities greater than 2240 units/mg. *See* O.P., Exs. 12–14 and Scripps's letter of May 19, 1987. These preparations read on each element of claims 24, 25, 28 and 29.[9] Genentech's recombinant Factor VIII:C therefore infringed these claims.

### iii. *Summary*

The undisputed facts establish Genentech's infringement of claims 24, 25, 28 and 29 by its production of plasma-derived and recombinant Factor VIII:C, and Scripps's motion must be granted on those claims. In all other respects its motion based on infringement of the product claims is denied.

## V. *Inducement to Infringe*

■■■ Scripps alleges that Genentech violated 35 U.S.C. § 271(b) by inducing Cutter to infringe the patent through the manufacture of both human and recombinant Factor VIII:C. 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." "This subsection contemplates that the inducer shall have been an active participant in the line of conduct of which the actual infringer was guilty." *Sims v. Western Steel Co.*, 551 F.2d 811, 817 (10th Cir.), *cert. denied*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977). To prove violation of § 271(b), Scripps must therefore demonstrate direct infringement by Cutter and that Genentech acted with the intent to induce such infringement. *See id.; Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

There is no question that Genentech delivered to Cutter materials found to have infringed, including recombinant and plasma-derived human Factor VIII:C, with the intent that Cutter itself would "use its reasonable best efforts to develop [recombinant Factor VIII:C] at its facilities, including ... development of a commercial scale process for the production of [recombinant Factor VIII:C]." Research and Development Agreement Between Genentech and Cutter Regarding Factor VIII. O.P., Ex. 19 at 13, ¶ 2.2. There is also no doubt that Genentech intended Cutter to use plasma-derived Factor VIII:C manufactured by both Genentech and Cutter which has been found to infringe. *See supra* at 1390–1391.

Accordingly, Genentech is found to have induced Cutter to infringe the '011 patent in violation of 35 U.S.C. § 271(b).

## VI. *Non-Infringement Under 35 U.S.C. § 271(e)(1)*

■■■ Genentech has renewed its motion for dismissal or summary judgment of non-infringement under 35 U.S.C. § 271(e)(1), which the Court denied without prejudice as premature by order of August 1, 1986. The Court has reconsidered its prior order in light of the memoranda submitted and the arguments made in connection with these motions, and for the reasons stated denies the motion.

Section 271(e)(1) provides:

It shall not be an act of infringement to make, use, or sell a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913)) solely for uses reasonably related to the development and submission of information under a Federal law which

---

**8.** In its initial offer of proof, Scripps merely made the unsupported allegation that Genentech's plasma-derived and recombinant Factor VIII:C "is believed to have a potency between 134 and 1172 u/ml." O.P. notes at 14 and 16. The potency of the preparations is, however, an essential element of claims 24, 25, 26, 27 and 29; moreover, Scripps carries the burden of proof at trial on this issue.

Although Genentech itself did not oppose Scripps's motion for summary judgment on the

ground that Scripps failed to produce evidence of potency in the claimed range, the Court advised the parties of the lack of evidence on this issue. Scripps responded by letter of May 19, 1987 with references to evidence already in the record. As Genentech has not contradicted the evidence, the Court considers it undisputed and probative on the issue of potency.

**9.** *See supra* discussion at 1390–1391.

regulates the manufacture, use, or sale of drugs.

This provision, enacted under the Drug Price Competition and Patent Term Restoration Act of 1984 ("Act"), Pub.L. 98–417, 98 Stat. 1585, overruled the Federal Circuit's 1984 decision in *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858 (Fed.Cir.), *cert. denied*, 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). The defendant in *Roche* had obtained from a foreign manufacturer a generic drug covered by a domestic patent in order to conduct bioequivalency tests necessary for FDA approval. The Federal Circuit held this use infringing, notwithstanding that it was "limited" to "testing and investigation strictly related to FDA drug approval." *Id.* at 861.

The 1984 Act established a streamlined procedure for FDA approval of generic drugs to hasten their introduction into the marketplace. Section 271(e)(1), enacted as § 202 of the 1984 Act, responded to congressional concern that under *Roche* the arrival of generics on the market would be delayed because bioequivalency testing required by the FDA could not begin until after expiration of the patent. *See* H.R. Rep. No. 98–857, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad. News 2647, 2678–79, 2692–93.

Genentech argues that all its uses of Factor VIII:C, though not solely for purposes related to FDA testing, bear some reasonable relationship to such purposes and hence are noninfringing under § 271(e)(1). The construction of § 271(e)(1) that Genentech urges the Court to adopt would, in effect, eliminate the express statutory limitation "solely for" and thereby immunize any use of a patented invention so long as some aspect of that use is reasonably related to FDA testing. This broad construction defies the plain mandate of the statute and the intent of Congress.

The statute's meaning is clear: the use of a patented invention is protected so long as that use is solely for purposes reasonably related to meeting the reporting requirements of federal drug laws. There-

fore, to establish entitlement to the statutory exemption, Genentech must demonstrate that it made and used plasma-derived and recombinant Factor VIII:C preparations solely for the purpose of meeting FDA reporting requirements.

This interpretation accords with the intent of Congress in enacting § 271(e)(1). The comments of the authors of the House Report emphasize the narrowness of the exemption. For example, the Report states that "a generic drug manufacturer may obtain a supply of a patented drug product during the life of the patent and conduct tests using that product if the purpose of those tests is to submit an application to FDA for approval." *Id.* at 2689. It further states that

the only activity which will be permitted by the bill is a limited amount of testing so that generic manufacturers can establish the bioequivalency of a generic substitute. The patent holder retains the right to exclude others from the major commercial marketplace during the life of the patent. Thus, the nature of the interference with the rights of the patent holder is not substantial.

*Id.* at 2692.

Even if the uses to which Genentech and Cutter put the Factor VIII:C were reasonably related to meeting FDA requirements, they certainly were not solely related to that purpose. Those uses also related, among other things, to preparation of Genentech's application for a European patent and to performance of the Genentech-Cutter agreement to develop a process for manufacturing Factor VIII:C on a commercial scale. Pursuant to that agreement, Genentech supplied Cutter with Factor VIII:C and received substantial sums from and agreed to share proprietary rights with Cutter. Furthermore, the agreement contemplates the marketing of recombinant Factor VIII:C outside the United States before expiration of the Scripps patent. These sales and uses of Factor VIII:C, serving multiple purposes unrelated to meeting FDA requirements, clearly lie beyond the protection of § 271(e)(1).

Genentech's motion to dismiss or for summary judgment under 35 U.S.C. § 271(e)(1) is therefore denied.

## VII. *Inequitable Conduct*

 Genentech has moved for summary judgment on the ground that the '011 patent was obtained by inequitable conduct and is therefore unenforceable. Scripps has made a counter-motion for summary judgment on this issue.

35 U.S.C. § 282(1) provides that unenforceability of a patent is a defense to infringement. *See generally J.P. Stevens & Co., Inc. v. Lex Tex. Ltd.*, 747 F.2d 1553, 1560–62 (Fed.Cir), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1984). A patent applicant owes the PTO an "uncompromising duty" of candor. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381, *reh'g denied*, 325 U.S. 893 (1945). The intentional failure to disclose material prior art constitutes inequitable conduct. *In re Jerabek*, 789 F.2d 886, 889 (Fed.Cir.1986). If the court determines that inequitable conduct occurred, *all* the patent's claims—"not just the particular claims to which the inequitable conduct is directly connected—are unenforceable." *J.P. Stevens*, 747 F.2d at 1561.

The party alleging inequitable conduct must prove by clear and convincing evidence "a threshold of materiality of the nondisclosed information and of the prosecutor's intent." *In re Jebarek*, 789 F.2d at 889. *See also J.P. Stevens*, 747 F.2d at 1559. Once threshold materiality and intent have been established, the court "must conduct a balancing test to determine, as a matter of law, whether the scales tilt to a conclusion that 'inequitable conduct' occurred." *In re Jerabek*, 789 F.2d at 890; *J.P. Stevens*, 747 F.2d at 1560. The balancing of equitable considerations to determine unenforceability is a matter of law in the province of the court. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1364 (Fed.Cir), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

## A. *Background*

The '011 patent application included five claims for monoclonal antibodies—claims 24 through 29. Claims 25 through 29 depended on claim 24 which, as amended, claimed antibodies with the following properties:

A monoclonal antibody for isolation of VIII:C from VIII:C/VIII:RP, said monoclonal being specific to VIII:RP and remaining complexed to VIII:RP when subjected to a saline solution elution and when said antibody is bound to a substrate.

Genentech contends that Scripps, in prosecuting its reissue application, failed to disclose to the PTO a reference to an abstract by Drs. Meyer, Obert, Zimmerman and Edgington entitled *Monoclonal Antibodies Specific for Factor VIII from Cellular Hybrids*, No. 395 (the Meyer abstract), which Genentech claims constitutes material prior art. Although the Meyer abstract was not directly disclosed to the examiner, it was cited in two articles by Dr. Muller (reference AAA) and by Drs. Meyer and Edgington (reference RS) submitted to the PTO. The examiner directed Scripps to demonstrate the properties of the monoclonal antibodies to Factor VIII:RP reported in the Meyer abstract and in two other abstracts, all of which related to the preparation of such monoclonals. On the ground that the difficulty of obtaining the monoclonal antibodies made the examiner's request "an impossible burden," Scripps withdrew claims 24 through 29 without prejudice. Reissue File History at 00419.

Genentech raised before the PTO the claim of inequitable conduct it asserts here. The PTO Office of the Assistant Commissioner rejected the claim, finding that there was "no clear and convincing evidence of a violation [by Scripps] of the duty of disclosure through bad faith or gross negligence, or of fraud." Reissue File History at 00517.

## B. *Materiality*

 Although the analysis to determine materiality has not been clearly articulated, the Federal Circuit appears to have

adopted as the "appropriate starting point" the standard of PTO Rule 56, 37 C.F.R. § 1.56. *J.P. Stevens*, 747 F.2d at 1559; *American Hoist*, 725 F.2d at 1363. That rule states that persons involved in the preparation or prosecution of a patent application

> have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

The cases have recognized that materiality may be established by application of several different factual tests: that a reasonable examiner would have allowed the claim but for the non-disclosure, that the particular examiner would have allowed the claim but for non-disclosure, or that the particular examiner's decision may have been affected by the non-disclosure. *J.P. Stevens*, 747 F.2d at 1559; *American Hoist*, 725 F.2d at 1362–63. The ultimate question for the court under the PTO standard, however, is whether threshold materiality has been established, i.e. whether a reasonable examiner, after he had become aware of the particular information, would consider it important in deciding whether to reject one or more claims. *American Hoist*, 725 F.2d at 1362–63 nn. 2 & 4. Thus, under the PTO standard, threshold materiality though turning on subsidiary questions of fact, is a legal conclusion to be determined by the court. *American Hoist*, 725 F.2d at 1363 n. 4. *See Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209 (Fed.Cir.1987). A threshold degree of materiality must be established by clear and convincing evidence. *J.P. Stevens*, 747 F.2d at 1559. *In re Jerabek*, 789 F.2d at 889. Moreover, "[a] reference that would have been merely cumulative is not material." *J.P. Stevens*, 747 F.2d at 1560. *See also Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed.Cir.1986).

Because the PTO has ruled on Genentech's claim of inequitable conduct, this Court does not write on a clean slate. The PTO's decision states in relevant part:

As pointed out by applicants, the Meyer et al. abstract contains no disclosure of the purification of Factor VIII:C. The Meyer et al. abstract contains no disclosure indicating that any of the monoclonal antibodies could be bound to substrate particles to form an immunoabsorbent for isolation and purification of VIII:C from the VIII:C/VIII:RP complex. Lacking such disclosure, the Meyer et al. abstract does not appear material to the examination of the claims that were presented in applicants' original application and issued in Patent No. 4,361,509. The Primary Examiner has found the original claims (claims 1–16) patentable over the Meyer et al. abstract.

\* \* \* \* \* \*

While the Meyer et al. abstract was not cited directly, the information contained therein of any relevance to the application was brought to the attention of the Examiner. The Meyer et al. abstract merely reports the production of monoclonal antibodies specific to Factor VII-IR:Ag (Factor VIII:RP). In the Third Supplemental Prior Art Statement filed September 12, 1984, the article by Muller et al. was presented to the Examiner. The production of monoclonal antibodies specific to Factor VIIIR:Ag by Meyer et al.[15] is reported therein as follows: Recently, the first application of this technique [production of monoclonal antibodies from mouse hybridomas] in the field of FVIII has been reported by Meyer et al. They prepared a number of mouse hybridomas producing monoclonal antibodies against VIIIR:AG. (Footnote 15 cites the Meyer et al. abstract.

The relevant information contained in the Meyer et al. abstract was thus brought to the Examiner's attention.

Reissue File History at 00517.

The PTO held, in essence, that the Meyer abstract was not material for two reasons: first, because it did not disclose whether the monoclonals had the properties claimed by Scripps; and second, because the relevant information had been brought to the

examiner's attention in other references, thus making Meyer cumulative.

Deference is due the decision of the Office of the Assistant Commissioner under the principle that "a qualified government agency [is] presumed to have properly done its job." *American Hoist,* 725 F.2d at 1359. *Windsurfing Int'l Inc. v. AMF, Inc.,* 782 F.2d 995, 998–99 (Fed.Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Whether a reference discloses material information and whether that information has been otherwise adequately disclosed are matters peculiarly within the expertise of the PTO. In determining whether Genentech has established threshold materiality by clear and convincing evidence, therefore, the Court must give substantial weight to the adverse findings of the PTO.

1. *Insufficient disclosure in the Abstract*

Genentech's own memorandum to this Court concurs in the finding of the Office of the Assistant Commissioner. It states:

Claim 24 also sets forth a property of the monoclonal antibody to VIII:RP, i.e., that it remains complexed to VIII:RP when subjected to a saline elution. The Meyer reference does not specifically state whether the antibodies disclosed therein have that property.

Memorandum at 11. Genentech contends, however, that the burden was on Scripps to prove that the Meyer antibodies did *not* have this property and that Meyer therefore does not constitute prior art. That argument flies in the face of the established rule that the burden is on the attacker to prove materiality by clear and convincing evidence. It is also inconsistent with the statutory presumption of validity of patents and the statutory burden of establishing defenses in actions involving infringement. 35 U.S.C. § 282.

Genentech also argues that materiality is shown by the examiner's request that Scripps produce a description of the properties of the monoclonals disclosed by Meyer, followed by Scripps's dismissal of claims 24 through 29.

The examiner, however, did not confine his request to the monoclonals in the Meyer abstract. Over the course of the reissue proceeding he asked Scripps to distinguish its claimed monoclonals over those disclosed in a number of references. *E.g.* Reissue File History at 00228–29 and 00413–19. Moreover, at the time he called for a description of the monoclonals in the Meyer abstract he also called for descriptions of monoclonals disclosed in two other abstracts, one of which was authored by Dr. Meyer. There is no evidence that the examiner singled out the Meyer abstract as a bar to claims in the patent or as more important than the other information. Nor did the examiner reject the claims in light of the Meyer abstract.

*A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392 (Fed.Cir.1986), on which Genentech relies, is distinguishable. That case involved evidence of inequitable conduct not limited to the failure to disclose a single reference. Moreover, the particular reference discussed in the opinion was described by the inventor himself as reporting methods similar to his own invention. In addition, the examiner, after discovering the reference, disallowed certain claims. In contrast, in this case Genentech relies on a single reference not shown to report essential properties of the claims. And Scripps dismissed its claims voluntarily without prejudice to avoid what it considered an unduly burdensome demand by the examiner.[10]

2. *Cumulative Information*

The record contains ample support for the conclusion reached by the Office of the Assistant Commissioner. The Meyer ab-

---

**10.** Genentech also relies on Dr. Zimmerman's deposition testimony that the examiner indicated during an interview that he would deny claims 24 through 29 if the monoclonals were unavailable for testing. This evidence is hearsay; as such, it is inadmissible and may not be considered on motion for summary judgment. *See Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 667 (9th Cir.1980). It is also vague and speculative and, in the context of the entire record, insufficient to sustain Genentech's burden.

stract was also cited in a paper authored, *inter alia,* by Dr. Meyer herself that was submitted by Scripps to the PTO as reference RS. The paper was listed in Scripps's Prior Art Statement under its title, "Hybridoma Antibody [11] Analysis of the Molecular Biology of Coagulation Proteins," and was described as "a survey article relating to studies of FVIII/vWF." It was presented and distributed at a November 3, 1981 conference. Edgington Decl. In contrast to the Meyer abstract, which is only one paragraph long, reference RS is 27 pages in length and much more elaborate in its disclosure of the method of making monoclonal antibodies to Factor VIII:RP and the properties of the monoclonals, including their capacity to bind Factor VIII:RP but not Factor VIII:C. Thus the Meyer abstract is cumulative to reference RS.

In addition, Scripps disclosed a number of other references concerning the production of monoclonal antibodies, which the examiner considered and described as follows:

> The OS, OR, OT and PR articles are cited to show that one of ordinary skill could prepare monoclonal antibodies to Factor VIII:R. Note especially ABSTRACT 0507 ... the 0507 ABSTRACT teaches preparation of the VIII:R monoclonal antibody. PR is perhaps most pertinent because of the full disclosure contained therein showing preparation of monoclonal antibodies to VIII:R.

Reissue File History at 00228–29.

Thus, the information contained in the Meyer abstract, though relevant to claims 24 through 29, was cumulative. Applying the teaching of *American Hoist,* the court in *Austin Powder Co. v. Atlas Powder Co.,* 593 F.Supp. 208, 212 (D.Del.1984) (Stapleton J.), held that "information which is relevant to [the] ... issues but cumulative" fails to reach the threshold of materiality, and a challenge to the validity of a patent based on such information should ordinarily be rejected without reference to the state of mind of the one charged with misconduct.

Genentech's motion, insofar as it addresses the issue of materiality, involves no evidentiary disputes and turns solely on a question of law. On the record before the Court, it must be concluded that Genentech has failed to prove materiality of the Meyer abstract by clear and convincing evidence. It is therefore unnecessary to reach the question of intent.

Genentech argues that even if its motion is denied, it should be given an opportunity to conduct further discovery and perhaps unearth additional grounds. On the issue of materiality, however, the entire record is before the Court and the question presented, involving only the interpretation of writings, raises no factual issues. As to the speculative possibility of other grounds for asserting inequitable conduct, the burden is on Genentech to come forward with specific facts demonstrating that Scripps is not entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e). It has not done so, nor has it made a showing how additional discovery will enable it to do so. *United States ex rel. Small Business Admin. v. Light,* 766 F.2d 394, 397–98 (8th Cir.1985); *In re Airport Car Rental Antitrust Litigation,* 766 F.2d 1292, 1296 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986).

Accordingly, Genentech's motion for summary judgment is denied and Scripps's motion is granted.

### VIII. *Preliminary Injunction*

■ Having concluded that Genentech has infringed certain claims of the '011 patent, and having rejected the defenses asserted by Genentech, the Court must address Scripps's request for preliminary injunctive relief.

Under 35 U.S.C. § 283 courts are authorized to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." In determining whether to issue a preliminary injunction the Court must weigh the following four factors:

---

**11.** A hybridoma antibody by definition is a mo-noclonal antibody.

first, whether plaintiff has demonstrated a reasonable likelihood of success on the merits, i.e. that the patent is infringed and valid;

second, whether plaintiff will be irreparably harmed if the injunction does not issue;

third, whether the threatened harm to plaintiff outweighs the harm the injunction may inflict on defendant; and

fourth, whether the injunction will disserve the public interest. *See Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1232–34 (Fed.Cir.1985); *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269–73 (Fed.Cir.1985); *and Smith Intern., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578–79 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Each factor will be considered in turn.

First, although Scripps is entitled to partial summary judgment on the issue of infringement, Genentech's challenge to the validity of the '011 patent remains unresolved. Genentech alleges several grounds for invalidating the patent in opposition to this motion. The evidence it has offered is sufficient at least to raise genuine issues as to validity. *Cf. Roper Corp.,* 757 F.2d at 1270. Because the parties have not yet had an opportunity to conduct relevant discovery on these issues, the Court is not in a position to determine whether a sufficiently clear showing of validity has been made to sustain a finding of a likelihood of success. *See Atlas Powder Co. v. Preco Chemicals,* 773 F.2d at 1233.

Second, because Scripps is therefore unable to make a sufficient showing of a likelihood of success on the merits, it is not entitled to a presumption of irreparable harm. *See Roper Corp.,* 757 F.2d at 1271–72. Instead, the Court must determine from the facts presented whether Scripps will suffer irreparable injury if the injunction does not issue. *Id.* Neither Genentech nor Cutter has made commercial use of recombinant Factor VIII:C; indeed, as yet they appear incapable of producing it on a commercial scale. There is no evidence that Scripps will suffer irreparable injury *pendente lite* if Genentech is permitted to continue its experimental work.

Genentech, on the other hand, stands to lose valuable time and research opportunities if enjoined from pursuing its work on Factor VIII:C. In addition, Cutter, which has paid substantial sums under its contract with Genentech to develop a process for commercial scale production of recombinant Factor VIII:C, may have intervening rights entitled to equitable protection. 35 U.S.C. § 252. An injunction directed at Genentech's activities is likely to hinder Cutter in developing what may be legitimate uses for Factor VIII:C. In balancing the relative hardships, the scales tip towards Genentech and Cutter.

Finally, Genentech makes a strong argument, supported by the declarations of three experts, that hemophiliacs could suffer if there is any delay in bringing recombinant Factor VIII:C to the market. Because recombinant Factor VIII:C is unlikely to contain infectious agents present in human blood, it virtually eliminates the risk inherent in plasma-derived Factor VIII:C of exposing hemophiliacs to the AIDS and other viruses. In addition, recombinant technology may ultimately provide a more economical and efficient source of Factor VIII:C than human or porcine plasma. The possibility that recombinant Factor VIII:C will have any of these advantages counsels against granting a preliminary injunction before Genentech has had an opportunity to produce evidence in support of its invalidity defense.

A preliminary injunction must therefore be denied at this time without prejudice.

In light of the Court's denial of Scripps's motion for a preliminary injunction, it is not necessary at this time to address the issue of intervening rights raised by Genentech.

## IX. ORDER

Scripps's motion for partial summary judgment (a) of infringement of claims 13, 24, 25, 28 and 29 of the '011 patent, and (b) for inducement to infringe those claims is granted.

Scripps's motion for preliminary injunction is denied without prejudice.

**1402**

Genentech's motion under 35 U.S.C. § 271(e)(1) is denied.

Genentech's motion for summary judgment of unenforceability is denied and Scripps's motion for partial summary judgment on the defense of inequitable conduct is granted.

In all other respects, the pending motions are denied.

The parties are directed to meet and confer with respect to further proceedings, including the possibility of settlement. Counsel shall appear at a status conference on Friday, September 11, 1987 at 10 a.m.

IT IS SO ORDERED.