**SCRIPPS CLINIC AND RESEARCH FOUNDATION, Revlon, Inc. and Rorer Group Inc., Plaintiffs,**

v.

**GENENTECH, INC. and Miles Laboratories, Inc., Defendants.**

**SCRIPPS CLINIC AND RESEARCH FOUNDATION and Revlon, Inc., Plaintiffs,**

v.

**CHIRON CORPORATION, Defendant.**

Nos. C–83–5423–WWS, C–83–5424–WWS.

United States District Court, N.D. California.

Feb. 24, 1989.

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Eugene Moroz, William S. Feiler, Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiffs.

Bradford J. Duft, James W. Geriak, Douglas E. Olson, Lyon & Lyon, Los Angeles, Cal., Richard Haas, Janet Morgan, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Bertram Bardley, James A. Giblin, Berkeley, Cal., Arnold Sprung, Nathaniel D. Kramer, Sprung, Horn, Kramer & Woods, New York City, for Genentech, Inc. and Miles Laboratories, Inc.

Bertram I. Rowland, William L. Anthony, Jr., Townsend & Townsend, San Francisco, Cal., for Chiron Corp.

WILLIAM W SCHWARZER, District Judge.

## CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1549 |
| II. | Anticipation | 1550 |
| III. | Best Mode | 1552 |
| IV. | Inequitable Conduct | 1555 |
| | A. The Reissue File History | 1555 |
| | B. The Facts Disclosed in Discovery | 1556 |
| V. | Reissue Application | 1557 |
| | A. Background Facts | 1557 |
| | B. Scope of the Original Patent | 1559 |
| | C. Sufficiency of the Declarations | 1560 |
| | D. Deference to the Examiner's Decision | 1561 |
| | E. Deference to the PTO | 1562 |
| VI. | Conclusion | 1562 |

## MEMORANDUM OF DECISION AND ORDER

### I. INTRODUCTION

Before the Court are various motions for summary or partial summary judgment filed by plaintiffs Scripps Clinic and Research Foundation, Revlon, Inc. and Rorer Group, Inc. (collectively "Scripps") and defendants Genentech, Inc. ("Genentech"), Miles Laboratories, Inc. ("Miles"), and Chiron Corp. ("Chiron").[1] For the nature of these actions and the background facts, reference is made to the Court's prior ruling, reported at 666 F.Supp. 1379 (N.D.Cal. 1987).

Argument by counsel has been heard and counsel have had an opportunity to examine and comment on a prior draft of this ruling. In addition, the Court has considered the post-hearing submissions of the parties.

■ A preliminary question is whether on the motions before the Court the validity of the entire reissue patent may be adjudicated or whether the Court may rule only on the claims alleged to have been infringed—namely, claims 13, 14, 17, 18, 24 through 29, and 34.[2] That question is answered in *Grain Processing Corp. v. American Maize–Products Co.*, where the Federal Circuit said:

There is no question that a case or controversy is a jurisdictional predicate for declaratory judgment under 28 U.S.C. § 2201. And "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." The actual controversy requirement precludes a declaration about the validity of claims unless the defendant objectively has a "reasonable apprehension that it will face an infringement suit" on those claims.

840 F.2d 902, 905–6 (Fed.Cir.1988) (citations omitted). The court's reasoning applies to these infringement actions. Defendants have no reasonable apprehension that they will face infringement claims by Scripps other than those currently asserted. Hence this Court may determine the validity of only those claims with respect to which infringement is alleged.[3] *See also Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 677 (Fed.Cir.1988) (vacating judgment of invalidity with respect to claims not alleged to have been infringed).

In ruling on all the motions before it, the Court is, of course, guided by the presumption of validity that attaches to every patent. 35 U.S.C. § 282. The presumption of validity remains intact throughout the litigation. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1379 (Fed.Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). The burden of proving invalidity is on the party asserting it and requires proof by clear and convincing evidence. *Custom Accessories v. Jeffrey–Allan Indus.,* 807 F.2d 955, 961 (Fed. Cir.1986). Upon reissue, the burden of proving invalidity becomes heavier. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985).

In making its ruling the Court has taken into account that the Examiner's decision is entitled to the deference "due to a qualified government agency presumed to have properly done its job." *American Hoist & Derrick Co. v. Sowa & Sons Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The Court has also considered the Examiner's decision as evidence, albeit not binding, in the determination whether defendants have met their statutory burden of proving invalidity by clear and convincing evidence.

---

1. Some of the defense motions were initially filed by Miles but all defendants have now joined in all motions and hence the motions will be treated as having been filed by all defendants.

2. Although the Court's order of February 5, 1988, held these actions, insofar as they allege infringement of claim 13, to be barred by 35

U.S.C. § 252, that claim will be treated as remaining before the Court in connection with these motions.

3. This statement is not intended as a ruling on any incidental effect that the Court's order may have on the remaining claims.

*Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985).

Since both plaintiffs and defendants have moved without reservation for summary judgment on the issues before the Court, there is no question as to the propriety of the Court's granting motions on those issues. Nevertheless the Court in each instance has made an independent determination and has satisfied itself that no material triable issues of fact remain. That "summary judgment is as appropriate in a patent case as in any other" was made clear by the Federal Circuit in *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988). There being no disputes as to material facts, the issues presented are questions of law proper for decision by summary judgment. *Id.* at 1561–62.

## II. ANTICIPATION

Scripps has moved for partial summary judgment on the defense of anticipation under 35 United States Code section 102(b). Defendants have made a counter-motion for summary judgment of invalidity on the same ground.

Section 102(b) precludes issuance of a patent if

the invention was ... described in a printed publication ... more than one year prior to the date of the application for patent ...

Defendants contend that the patent in suit, No. Re 32,011 ("the '011 patent") was anticipated by a number of publications only one of which needs to be addressed.[4] That publication is a dissertation by Robert B. Harris entitled "Isolation and Characterization of Low Molecular Weight, Non–Aggregated Antihemophilic Factor from Fresh Human Plasma" (1979), Scripps's Supp. Memo in Support of Motion for Summary Judgment on Anticipation, Ex. 27 ("Harris dissertation"). It is not disputed that the dissertation is a publication within the meaning of section 102(a), (b).[5]

To anticipate a later claimed invention, a prior publication must contain all the essential elements of the patent claim. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). The prior art must also be "enabling," meaning that it must place the allegedly disclosed matter in the possession of the public. *Akzo N.V. v. U.S. Intern. Trade Comm'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).

Defendants have both the burden of production of evidence on the issue of anticipation and the ultimate burden of proof. *Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed.Cir.1985). However, once defendants present a prima facie case of anticipation, the burden shifts to Scripps to produce countervailing evidence. *Id.* at 1022–23. Scripps cannot rely on the presumption of validity alone to preclude summary judgment. *See SSIH Equipment S.A. v. U.S. Intern. Trade Comm'n*, 718 F.2d 365, 375 (Fed.Cir.1983) (presumption of validity does not have independent evidentiary value); *cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (nonmoving party must go beyond pleadings to establish a genuine issue of fact for trial).

Whether prior art anticipates the claimed invention generally is a question of fact. *Hybritech*, 802 F.2d at 1379. Where no issue of material fact is raised, however, summary judgment is appropriate. *Chore–Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983) (affirming summary judgment on anticipation).

The claims defendants contend were anticipated by the Harris dissertation read as follows:

24. A human VIII:C preparation having a potency in the range of 134 to 1172 units per ml. and being substantially free of VIII:RP.

---

4. There are triable issues of fact as to whether the other articles relied upon by defendants anticipate the '011 patent.

5. The Harris dissertation was not among the prior art considered by the Examiner.

26. A human VIII:C preparation of claim 24 wherein the ratio of VIII:C to VIII:RP is greater than 100,000 times the ratio in plasma.

27. A human VIII:C preparation of claim 24 wherein said VIII:C is isolated from VIII:C/VIII:RP and 90–100 percent of the VIII:RP has been removed.

The Harris dissertation describes a method for preparing "[h]igh purity AHF [Factor VIII:C]." (Harris dissertation at iii, 54–56.) After lyophilization and reconstitution a preparation made according to his description would have a "71 fold concentration" and "no detectable vWF-ag [VIII:RP]" and a "AHF-vWF ratio [of] . . . at least 10,000:1." (*Id.* at 56). In his declaration, Harris states that the dissertation "accurately reports on my work in which I was able to, and did, obtain a human VIII:C preparation having a potency of 193 units/ml and being substantially free of VIII:RP, the ratio of VIII:C to VIII:RP being greater than 100,000 times the ratio in plasma." (Miles Memo. Ex. AA, Harris Dec. at 3.) If Harris's description is correct, the dissertation anticipates claims 24, 26 and 27.

Scripps first disputes that Harris achieved human Factor VIII:C. Its arguments rest in part on a supplemental declaration prepared for Harris by Scripps's counsel and signed by Harris. (Harris Supp. Decl., Scripps Reply Ex. 38.) However, a fair reading of the supplemental declaration does not contradict the earlier declaration. Rather, it confirms that Harris concluded that he had achieved Factor VIII based upon three tests he made: (1) his preparation's reaction with homologous Factor VIII antibodies, (2) its performance in *in vitro* clotting assays, and (3) its thrombin activation.[6] (*Id.* at 4.) In his final declaration, Harris states: "The data in my dissertation unequivocally indicates that I did isolate VIII:C." (Defendants' Joint Reply, Harris Final Dec. at ¶ 6.)

In sum, there is substantial evidence before the Court that Harris had in fact achieved VIII:C with a potency and a ratio of VIII:C to VIII:RP within the range in claims 24, 26, and 27. Scripps's argument amounts to nothing more than that the tests made are not "dispositive of the presence of Factor VIII:C." But Scripps has come forward with no evidence to dispute Harris's conclusions.

Even if Harris achieved VIII:C, Scripps argues, the preparation lacked the potency disclosed in the claims. The argument rests on Harris's admission in his supplemental declaration that the number of units of VIII:C obtained in one experiment (19.3 units/ml) was incorrectly stated on page 56 of the dissertation; the actual value reported there should have been 9.5 units/ml. (Ex. 38 at 5.)

As he explains in his final declaration, however, this error is not relevant to his conclusion. For example, the summary of the results of one of his purification experiments reported at page 56 and in Figure 9 of his dissertation is not questioned. In that experiment, he obtained 2.7 units/ml. After further concentration described in the dissertation, by freeze-drying followed by reconstitution of the product in 0.1 ml. of water, resulting in a 71 fold concentration, he obtained 191.7 units/ml., well within the potency range of claim 24.[7] (Harris Diss. at 56, Harris Decl. at ¶ 2, Harris Final Dec. at ¶¶ 4–6, 8–9.) Harris's declaration further reaffirms that the preparation was substantially free of VIII:RP and had more than 90% of the VIII:RP initially present removed. (Harris Final Dec. at ¶ 3, 7.) Again Scripps has come forward with no evidence to dispute the validity of the potency and purity claims.

Similarly, Scripps's wholly unsupported contentions concerning the inadequacy of

---

6. Harris also based his identification of his preparation upon sodium dodecyl sulfate polyacrylamide gel electrophoresis (SDS–PAGE) tests. While Harris' gel patterns do not match the gel pattern found by Dr. Fulcher, there is no evidence that if he had VIII:C, it would necessarily have the gel pattern found by Dr. Fulcher.

7. The potency of the reconstituted preparation is obtained by multiplying the 2.7 units by the 71 fold concentration factor.

**1552**

the SDS Gel Pattern and the other tests described in the Harris dissertation are insufficient to raise an issue in the face of the Harris declaration; to oppose defendants' motion, Scripps had to come forward with specific facts in declarations or other form admissible in evidence. Fed.R.Civ.P. 56(e).[8]

Defendants have produced clear and convincing evidence that the Harris dissertation disclosed and enabled Factor VIII:C having the characteristics claimed in claims 24, 26 and 27. That evidence is sufficient to overcome the presumption of patent validity and to shift the burden of coming forward with countervailing evidence to Scripps. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed. Cir.1985). Scripps has come forward with no conflicting evidence. Accordingly defendants are entitled to summary judgment of invalidity as to claims 24, 26 and 27.

### III. BEST MODE

Scripps has moved for partial summary judgment on the defense of its alleged failure to disclose in the '011 patent the "best mode" under 35 United States Code section 112. Defendants have made a counter-motion for summary judgment of invalidity on the basis of that defense.[9]

Section 112 in part provides that the specification of a patent "shall set forth the best mode contemplated by the inventor of carrying out his invention." Failure to comply with this requirement results in invalidity. 35 U.S.C. § 282(3). The Federal Circuit has explicated the best mode requirement as follows:

> Because the best mode provision of § 112 speaks in terms of the best mode "contemplated by the inventor," there is no objective standard by which to judge the adequacy of a best mode disclosure.

Instead, only evidence of "concealment," whether accidental or intentional, is considered. The specificity of disclosure required to comply with the best mode requirement must be determined by the knowledge of facts within the possession of the inventor at the time of filing the application.

*Spectra Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed.Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987) (citations omitted).

Compliance with the best mode requirement normally is a question of fact. *Spectra–Physics*, 827 F.2d at 1535–36. In these cross-motions, however, both parties maintain, correctly, that there are no disputed issues of fact and consequently have presented the issue as one of law. *Cf. Dana Corp. v. IPC Limited Partnership*, 860 F.2d 415, 8 U.S.P.Q.2d (BNA) 1692, 1696 (Fed.Cir.1988) (JNOV proper on issue of best mode where insufficient evidence introduced to support finding best mode requirement satisfied).

The best mode requirement mandates disclosure by the inventor not simply of generic information for carrying out the invention but also of the *best mode contemplated* by the inventor. *Spectra–Physics*, 827 F.2d at 1536. *Spectra–Physics* illustrates the operation of the requirement. One inventor claimed a product, a laser, and disclosed brazing as the means for attaching copper cups to the ceramic discharge tube of the laser, but failed to disclose the specific method it found critical to success, namely, TiCuSil active metal brazing. *See also Union Carbide Corp. v. Borg–Warner Corp.*, 550 F.2d 355, 361–62 (6th Cir.1977) (generic disclosure of extruder did not disclose best mode where evidence showed that inventor considered a particular kind of extruder as the best mode and installed it at the pilot plant at

---

**8.** Scripps has offered only an inadmissible article reporting that a researcher found that a substance called von Willebrand Antigen II produced the same results in *in vitro* clotting assays and in testing with homologous Factor VIII antibodies and with thrombin activation.

**9.** Although the Examiner's grant of the reissue patent was reviewed and upheld by the Office of

the Assistant Commissioner ("PTO") upon the filing of protests, none of the protests raised the best mode issue and hence the decision refusing rejection is not material here. *Cf. American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d at 1359–60 (no deference to PTO's decision on validity where prior art not before the PTO).

substantial expense); *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 488 F.2d 382, 388–89 (1st Cir.1973) (disclosure in patent of insulative materials "in the classification of epoxys, phenolics or silicones" did not satisfy best mode requirement where inventor knew that many materials in the classification would not work and that a specific material, RX600, worked very well).

*Spectra–Physics* is on all fours with the instant case.[10] The '011 patent discloses the use of monoclonal antibodies[11] generically for the purification of the Factor VIII:C preparation. (Ex. A Reissue File History 00004–05.) Drs. Zimmerman and Fulcher, in applying for the patent, represented to the Examiner that

the monoclonal column is the major contributing factor to the purification of VIII:C.

(*Id.* 00391.) The embodiment of the product claimed in claims 24 through 29 is reflected in Table I of the patent. (*Id.* at 00008.) To achieve the results described in Table I the inventors used a particular monoclonal antibody which they did not identify or describe, namely the antibody identified as 2.2.9 in this proceeding. The record establishes without dispute that not any monoclonal antibody will achieve those results. Dr. Zimmerman, in his deposition, agreed that

[m]erely making an antibody to RP doesn't necessarily mean it will work in [this] process.

(Depo. 238.)

The record also shows that a person skilled in the art would not know this from reading the patent nor would he know which antibody would work or where to obtain it. Dr. Zimmerman himself testified: "I could not predict how to make a monoclonal antibody that would be as effective as the ones we're currently using [2.2.9]. I could not predict with certainty." (Depo. 151.) Zimmerman and his associates engaged in a lengthy process of developing the monoclonal antibody that would produce the results in Table I.[12] Eventual-

10. *Randomex, Inc. v. Scopus Corp.*, 849 F.2d 585 (Fed.Cir.1988), on which Scripps relies, is not on point. In that case, a cleaning solution was needed to practice the invention, a portable apparatus for cleaning disk pads. The inventor disclosed the best mode, along with others, but without identifying it as such. The case held that "[t]he indiscriminate disclosure ... of the preferred cleaning fluid along with one other possible cleaning fluid satisfies the best mode requirement." *Id.* at 589. The court observed, moreover, that "[t]he world is full of cleaning fluids produced by persons skilled in the cleaning fluid art, who know what are proper or improper uses for each cleaning fluid." *Id.* The same can hardly be said of monoclonal antibodies that bond with Factor VIII:RP to produce the particular preparation claimed in the patent.

So the applicants advised the Examiner in their effort to distinguish prior art references. In their Remarks to the Examiner, they stated, "[T]he preparation of monoclonal antibodies for a particular purpose was not a simple job in 1981." (Ex. A Reissue File History 00343.) They described how, after a lengthy investigation, Dr. Katzman failed to obtain a monoclonal antibody that would bind VIII:RP out of plasma. (*Id.* 00344.) And elsewhere, they distinguished a reference because "there is no mention of how the particular monoclonals are prepared ... the missing details clearly do not put the public in possession of ... the highly specialized monoclonals ... reported." (*Id.* 00348.) Thus it

would seem that Scripps's present position conflicts with that it took to secure the patent.

11. An antibody is created by cells within a living organism in response to an antigen (foreign molecule) and binds to a specific binding site on the antigen. An antigen usually has several different binding sites to which different antibodies specific to those sites can attach. A monoclonal antibody is an antibody which recognizes only one kind of antigen. It is produced in a laboratory by a hybridoma cell line, created by the random fusion of mouse antibody-producing spleen cells with cells from an immortal cancer cell line. A successful hybridoma cell line is immortal and will produce a single species of identical antibodies, all directed to the same binding site. The cells of a hybridoma cell line are, likewise, identical. Hybridomas can be stored.

12. Dr. Zimmerman's laboratory, together with other experts, worked for almost one year to develop the specific monoclonal antibody ultimately selected by Drs. Zimmerman and Fulcher. After an unsuccessful first attempt, they eventually made 2000 assays of cell fusions taken from hybridoma. From these were selected cell lines that produced antibodies against Factor VIII:RP; these in turn were used to produce subclones from among which the inventors made their final selection of the antibody with the best binding characteristics. (Roberts Dec.; Depo. 75–79, 92–94.)

ly they settled on what they identified as the 2.2.9 antibody. At the time of the filing of the original patent application, Drs. Zimmerman and Fulcher had determined that the 2.2.9 antibody was the best mode for the process and selected it to practice the invention. Dr. Zimmerman testified:

Q. ... And prior to the time you filed your application, how many clones did you have?

[colloquy]

THE WITNESS: I'm pretty certain we had at least four....

At least four clones.

Q. Yes. And for the examples in your patent, and specifically Table I, did you select the specific clone to be used for repeating that experiment?

A. With Dr. Fulcher we selected, *she and I selected a specific clone.*

Q. I see. And how did you go about selecting that clone?

A. We took three different preparations of monoclonal antibodies, that is monoclonal antibodies from three different clones.

Q. Yes.

A. These monoclonal antibodies were coupled to ACA–22 beads using glutaraldehyde as a coupling agent.

These antibody beads were mixed with plasma containing the Factor VIII/von Willebrand factor complex to determine whether Factor VIII:R, that is von Willebrand factor, VIII:R would be absorbed to the beads. It was *determined that one clone of the three bound them well. That was 2.2.9.*

(Depo. 240–241, emphasis added.) Dr. Zimmerman further agreed that "at the time [he] filed [the] application, [he] did [not] know of any other better clone that could be used than the 2.2.9." (Depo. 250.) He recommended it for production of the preparation, (Tarr Depo. 36), and that antibody is the only one used by Scripps and its associates in their efforts to develop a commercial product (D'Alisa Depo. 334–35).

Scripps has come forward with no evidence to dispute any of the foregoing. The arguments it makes simply ignore the record. Thus, it asserts that "the so-called 2.2.9 clone ... is not the best mode" (Reply at 2), that "[a]ny number of monoclonal antibodies will work according to the detailed description," and that "[s]ection A [of the patent] includes a description of the best way of selecting suitable monoclonal antibodies for ... the process" (Reply at 4). These assertions are refuted by the testimony of the inventors noted above. Scripps argues that the best mode is set forth in Section A of the '011 patent, but its argument, as well as its citation of cases ignores the distinction between enablement and best mode. *See e.g.,* the quotation from *In re Wands,* 858 F.2d 731 (Fed.Cir. 1988), Reply at 8–9.

The fact that others may have been able to practice the invention, as Scripps argues, is irrelevant to the best mode issue. *See Dana Corp. v. IPC Limited Partnership,* 860 F.2d 415, 8 U.S.P.Q.2d (BNA) 1692, 1696 (best mode requirement not satisfied by level of skill in the art).

It is also of no moment whether the inventors or Scripps made the 2.2.9 antibody available to others. Even had they done so it would not affect whether the inventors made an adequate disclosure of their invention.

■ In sum, the undisputed facts establish that the method of producing purified Factor VIII:C disclosed by the patent did not work with every monoclonal antibody, that the inventors had developed a specific antibody—identified as 2.2.9—which they contemplated to be the best mode to practice the invention, and that they did not disclose in the patent or otherwise the existence of that best mode, let alone its characteristics.

---

Scripps attempts to equate these efforts with "the droning use of clerical skill" described in *In re Sherwood,* 613 F.2d 809, 816 (C.C.P.A.1980). However, in *Sherwood* the court found that disclosure that a computer program was required and the disclosure of the necessary mathematical equations and "trick" in analysis that such a program must contain was "not so poor as to result in the concealment of the best mode." 613 F.2d at 817. Here, in contrast, the only characteristic of the requisite antibody revealed is that it should work in the process.

Accordingly, there being no material issue of disputed fact, defendants' motion for summary judgment finding claims 13, 14, 17, 18, 24 through 29 and 34 invalid under sections 112 and 282 must be granted.

## IV. INEQUITABLE CONDUCT

■ The Court has previously considered the defense of inequitable conduct on different grounds. *See* 666 F.Supp. at 1397–1400. That prior ruling, while stating the controlling legal principles, does not foreclose the newly-made motion, filed in opposition to Scripps's motion, based on new grounds developed in subsequent . discovery.[13]

As in the best mode motion, the parties maintain that no material facts are in dispute and that summary judgment is appropriate. Moreover, inequitable conduct is a question of law appropriately decided on summary judgment in the absence of evidentiary disputes. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1364 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

A. The Reissue File History

In remarks submitted to the Examiner in August 1984, applicants' counsel first distinguished *In Re Fisher,* 427 F.2d 833, 57 C.C.P.A. 1099 (1970), which holds that the disclosure must support open-ended claims, by stating that "the product claimed is at the essentially pure level." (Ex. A 00365.) In an accompanying second supplemental declaration, Drs. Zimmerman and Fulcher stated that "we have achieved purified VIII:C at levels very near what we believe to be the theoretical values with the claimed process." (Ex. A 00391.) They explained that the theoretical values were not achieved because of the "release of trace amounts of other proteins" which can be readily removed. *Id.*

In a subsequent Office Action, rejecting certain claims, the Examiner observed that at the specified level of purification, there was contamination with fibrinogen and fibronectin. How, then, can such Factor VIII:C be considered substantially pure?

(Ex. A 00397–98.)

Responding by way of a request for reconsideration, applicants' counsel cited the Katzman declaration in support of the claim that the specification teaches the production of "essentially pure VIII:C." (Ex. A 00407.) Counsel referred to fibrinogen and fibronectin as "trace materials" the removal of which "is only a matter of selecting a suitable reagent." (Ex. A 00408.) He stated that, "[t]he data in the Invention Disclosure are based upon smaller scale runs ... sufficient for the applicants to indicate ... that VIII:C is virtually pure." (Ex. A 00409.) Once again distinguishing *In re Fisher,* counsel stated that

the range of purification from that de- ·scribed in their specification ... is either trivially small or non-existent ... [and] their product is essentially pure VIII:C. The record clearly demonstrates that the specification teaches those skilled in the art the production of essentially pure VIII:C....

Applicants' purity claims have an inherent upper limit of 100% ..."

(Ex. A 00409–10.)

In a subsequent record of interview, counsel stated that "[i]t was explained to Examiner Schain that the VIII:C is essentially pure." (Ex. A 00421.) This statement is affirmed in Dr. Zimmerman's accompanying declaration, which continues:

7) It is a trivial matter to remove the fibrinogen and fibronectin once they have been identified. Dr. Fulcher and he have removed those contaminants with the use of monoclonals to fibrinogen and fibronectin....

8) Figure 1. of [their] 1983 paper [shown to the Examiner], shows an essentially pure VIII:C product.

9) In his opinion, the use of monoclonals or other techniques to remove these

---

13. The specific grounds of inequitable conduct asserted here were not raised in the protest to or considered by the PTO. (Ex. A 00513–18.)

trace contaminants were trivial and well within the skill of the art and that this minor clean-up would be apparent to those skilled in the art.

\* \* \* \* \* \*

11) The Examiner also requested a clarification of why Dr. Fulcher and he reported in their invention disclosure that they had achieved a specific activity in the range of 5000–8000 units/mg when they have stated that it is their opinion that the theoretical limit is 5000 units/mg. He indicated that this early work was done on a smaller scale and that the amount of material was small. As a result, the protein assays were at the lower end of the detection range. While these data qualitatively indicated a high purity product, they are not quantitative. When large scale runs were made and more protein was available, he and Dr. Fulcher were able to arrive at the quantitative values reported in the patent.

12) He indicated to the Examiner, that data for large scale runs are the data which were included in the patent because they were more reliable data than those contained in the invention disclosure.

(Ex. A 00425–26.)

Relying on those representations, the Examiner withdrew the rejection of the claims. (Ex. A 00432.)

B. The Facts Disclosed in Discovery

Dr. Fulcher testified in her deposition that as of the time of the filing of the patent application, her tests indicated that the VIII:C obtained from the monoclonal column covered by the patent contained contaminants (fibrinogen and fibronectin). She described those tests as "more qualitative than quantitative" and therefore not informative as to the extent of these contaminants. (Fulcher Depo. 71–73.) Dr. Fulcher could not recall whether prior to the filing any of the tests run ever disclosed pure VIII:C, but believed some did. (Id. at 73.)

Dr. Zimmerman, who in his declaration to the Examiner stated that the VIII:C produced by the applicants contained only "trace contaminants," Ex. A 00425, refused in his deposition to say what percentage of impurities he had in mind when he made that representation, (Zimmerman Depo. 40–44). As he put it: "I felt that there were small amounts of contaminants. I did not put a percentage on it … I did not have numbers for upper limits." (Depo. 43.)

Although in their declaration the inventors relied on the declarations of Drs. Katzman and Hrinda to support the purity values they claimed, Ex. A 00391, Dr. Fulcher testified that "I have no understanding of what (Hrinda) did," Fulcher Depo. 101. Although throughout the application proceedings, the applicants used the term "essentially pure," Dr. Fulcher in her deposition was unable to quantify this term or the term "highly purified." (Id. at 520, 538.) Although in their declaration they stated that "when large scale runs were made and more protein was available, [they] were able to arrive at the quantitative values reported in the patent," Dr. Fulcher could identify no tests made to confirm those values. (Id. at 581–90.)

At the hearing, counsel for Scripps contended that Drs. Zimmerman and Fulcher based their representations to the Examiner on a good faith belief that they had achieved essentially pure VIII:C. In support of the argument, counsel referred to certain Laurells of the product, made as it came off the monoclonal column, in which Dr. Fulcher detected no fibronectin. A Laurell is a test of a fraction, i.e., a small portion of the stream of product from the monoclonal column. The amount of fibronectin (or other impurity) found in one fraction gives no indication as to the amount that will be found in others. It is therefore impossible to extrapolate from one or several Laurells as to the degree of purity of the entire output of the column. (Dec. 2, 1988 hearing, Tr. 16–18.)

Even if Dr. Fulcher obtained some Laurells in which no impurities were detected, the critical run on which the claims reported in Table I of the '011 patent were based produced material that was not "essentially pure"—to the contrary, Dr. Fulcher's contemporary laboratory note estimated that it

contained up to 50% fibronectin. (*Id.* 26–30, Ex. AN.)[14]

It was conceded by Scripps at the hearing that "[p]urity is a key," and that "[t]he value of this invention is the production of human VIII:C that is essentially pure." (Tr. 23–24.) Moreover, Scripps acknowledged that the meaning of the inventors' representation to the Examiner was that the process would generally produce essentially pure VIII:C. (Tr. 20–21.) But the undisputed evidence shows that (1) only some of the fractions appeared to be free of fibronectin while others were not, (2) the inventors were unable to quantify how much fibronectin the stream of the product from the column contained, and (3) the fraction on which the patent application (Table I) was based contained up to 50% fibronectin.

█ In short, on the material issue of purity, Drs. Zimmerman and Fulcher made crucial factual assertions, for the purpose of reversing the Examiner's initial rejection of the open-ended purity claims, for which they had no factual support. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987) (three elements of inequitable conduct: material prior information, chargeable to applicant, not disclosed to PTO). The undisputed facts constitute clear and convincing evidence of inequitable conduct by applicants. *See J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559–62 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The materiality of the representations, the lack of factual basis for the representations, and the applicants' knowledge of the information and its materiality are indisputable.

Accordingly, defendants' motion for summary judgment on the defense of inequitable conduct must be granted as to the claims in issue. *See J.P. Stevens*, 747 F.2d at 1561 (inequitable conduct makes all claims of patent unenforceable, not just those directly connected with the inequitable conduct).[15]

## V. REISSUE APPLICATION

### A. Background Facts

Scripps has moved for partial summary judgment on the defense asserted by Genentech and Miles that the '011 patent is invalid for failure to comply with 35 United States Code section 251. All of the claims alleged to have been infringed, except claims 13 and 14, are claims of the '011 patent.

Prior to the hearing, the Court advised Scripps that it was considering granting summary judgment for defendants on this

---

14. Dr. Fulcher gave the following answers in her deposition:

Q. Did you ever discuss or did you ever come to a conclusion as to how much fibronectin was present in fraction three or Table I as reflected on 104?

A. I would have to say I don't think I could then or now make a conclusion based on the data.

Q. I see. Did you ever come to a conclusion of what percent Factor VIII:C was present as compared with contaminants?

* * * * *

THE WITNESS: Other than what I have written here, which is very approximately 50 percent fibronectin as a worst case estimate, I guess really I don't know how much—relatively how much fibronectin was present relative to VIII:C other than what I have written here and that I've qualified.

Q. I see. Could you have no better estimate?

A. I have no further estimate, no.

Q. If you have no further estimate, you have no better estimate, is that right?

* * * * * *

THE WITNESS: I don't have any better estimate. I don't know what would be a better estimate, actually, what technique to use.

BY MR. SPRUNG:

Q. Now, do you have any other or better—any other estimate as to the percent of VIII:C that's present as compared to contaminants, total contaminants?

MR. FEILER: Again, you're talking about the prep on 104?

MR. SPRUNG: Right.

THE WITNESS: I don't think so.... (Fulcher Depo. 631–32.)

15. Both *J.P. Stevens* and *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874, (Fed.Cir.1988), state that a determination that inequitable conduct has occurred renders the "entire patent" unenforceable. However, as noted above, the Court has jurisdiction only over those claims with respect to which infringement is alleged. *See supra* page 1549.

issue, and gave it the opportunity to come forward with evidence sufficient to raise a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). No showing has been made.

Section 251 states in relevant part:

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall [reissue the patent for the invention].

The regulations require the applicant to file with the application a reissue oath as follows:

(3) When it is claimed that such patent is inoperative or invalid "by reason of the patentee claiming more or less than he had the right to claim in the patent," distinctly specifying the excess or insufficiency in the claims.

\*  \*  \*  \*  \*  \*

(5) Particularly specifying the errors relied upon, and how they arose or occurred.

37 C.F.R. § 1.175(a)(3), (5). Defendants contend that the '011 patent was improperly issued "in view of lack of error and the lack of Section 112 disclosure."[16]

The reissue application was supported by the declaration of Drs. Zimmerman and Fulcher, submitted December 21, 1983, stating in relevant part:

I. They believe the original patent to be wholly or partly inoperative or invalid by reason of:

(a) A partial defective specification in that the VIII: RP removal rate specified at Column 3, line 29 is incorrectly reported as "1,000 units per ml of beads". The correct rate is "10–20 units per ml of beads". The error is believed to be clerical in origin and arose without defective

intent. The error is corrected by an amendment to the specification.[17]

(b) Their claiming less than they had a right to claim by failing to obtain claims of varying type and scope and claims directed to VIII:C preparations and specific monoclonal antibodies. They further believe that this error arose from the failure of their attorney to recognize that these types of claims were available. The defect is corrected by addition of new claims 17–35. The error arose without any deceptive intention on their part.

(Ex. A 00035.) Eighteen months later, in response to the Examiner's inquiry, applicants submitted a supplemental declaration with substantially the same language, except for references to newly submitted claims. (Ex. A 00522–24.)

In August 1984, applicants filed two declarations by the attorneys responsible for the original prosecution, Herbert Cohen and Ernest B. Lipscomb, III. (Ex. A 00315–20.) The Cohen declaration states in relevant part:

5) With regard to error in claiming less than the inventors were entitled to claim, he did not fully appreciate the nature and extent of their discovery. Thus, he did not prepare claims of the type presented in the reissue application of broad enough scope and directed to the types of discoveries made by the inventors to provide the patent protection to which the invention is entitled.

6) He patterned the claims in his application after the Hagan Patent claims, i.e. method and product-by-process.... He did not appreciate that product claims per se in addition to product-by-process claims could be presented.

(Ex. A 00316.) The Lipscomb declaration states in relevant part:

(5) With regard to the error in claiming less than the inventors were entitled to claim, he did not fully appreciate the nature and extent of their discovery. While he did review the claims prepared by Cohen and those contained in the ap-

---

16. The section 112 issue is addressed in the best mode discussion, *supra* at 1552.

17. This ground does not appear to be controversial and since it does not affect the outcome, is not discussed in this ruling.

plication as filed, he did not fully appreciate the claims of the type sought by reissue were possible.

(Ex. A 00319.)

After reviewing the record and considering the declarations, the Examiner withdrew his rejections and granted the reissue patent. In an Office Action dated November 11, 1984, he ruled:

(21) The rejection of claims 19–35 under 35 USC 251 is withdrawn for the reasons given by applicant at pp. 35–38 of the amendment, pp. 1–2 of the second Supplemental Declaration, the Supplemental Amendment (claim 34) and the comments made at page 4 of the Supplemental Amendment.

(22) The rejection of claims 1–42 under 37 CFR 1.175 is withdrawn for the reasons given by applicant at pages 41–42 and in view of the Cohen and Lipscomb Declarations and paragraph 9 of the Zimmerman–Fulcher Supplemental Declaration. However, prior to issuance of the patent, the original patent must be surrendered; 37 CFR 1.178.

(Ex. A 00396–97.)

**B. Scope of the Original Patent**

One prerequisite for gaining the benefits of section 251 is proof that "broadened claims sought by the reissue application are supported by the original patent disclosure ..." *In re Peters,* 723 F.2d 891, 894 (Fed.Cir.1983).[18] A reissue claim is available where "the overall disclosure of the application as originally filed reasonably conveys to the artisan that [at the time the original application was filed] the inventor had possession of the later claimed invention." *In re Kaslow,* 707 F.2d 1366, 1375 (Fed.Cir.1983).

The description of the preferred embodiments in the '509 patent sets forth in Table I "data ... representative of that obtained according to the present invention," Ex. A 00023; neither those data nor the rest of the original disclosure support the broadened claims. The relevant data and the corresponding reissue claims are as follows:

| | Table I | Reissue Claims |
|---|---|---|
| Potency | 134–1172 U/ml | Claim 24: same but adds "substantially free of VIII:RP" |
| Fold Purification | 163,857—169,285 | Claim 25: "at least 160,-000," without limit |
| Ratio of VIII:C to VIII:RP | —— | Claim 26: "greater than 100,000 times the ratio in plasma," without limit |
| Removal of VIII:RP | —— | Claim 27: "90–100% of the VIII:RP has been removed." |
| Specific Activity | 2294—2370 U/mg | Claim 28: "greater than 2240 U/mg," without limit |

In addition, the original application for the '509 patent drafted by attorney Cohen was revised by Drs. Zimmerman and Fulcher before it was filed. Their revisions qualified the claims with respect to purity by, *inter alia,* (1) changing "virtually pure" to "highly purified;" (2) adding "largely" before "free of contaminants;" (3) replacing a reference to "virtually no contaminants" with a number for fold purification; and (4) deleting a reference to "uncontaminated" and a specific activity of 5,000 to 8,000 units/mg. and substituting 2,300 units/mg. (Ex. A 00281–87.)

It thus appears that the reissue patent claims potency, purity, and specific activity substantially exceeding the original patent. In particular, Claims 25, 26 and 28 are open-ended, and Claims 26 and 27 make claims with respect to removal of VIII:RP as to which the '509 patent is silent.

**18.** The relevant disclosure is that made in the patent application. *See* 35 U.S.C. § 251 (patent may only be reissued "for the invention disclosed in the original patent").

There is no evidence that the inventors had possession of the broad invention at the time the original application was filed. *Kaslow*, 707 F.2d at 1375. The references submitted by Scripps in its post-hearing supplemental memorandum contain no such evidence, nor do they demonstrate that the original disclosure reasonably conveyed to persons skilled in the art that they had possession of it. *Id.*

## C. Sufficiency of the Declarations

An applicant for a reissue patent must also demonstrate that the patent is partly inoperative or invalid because through "error without any deceptive intention ... the patentee claim[ed] ... less than he had a right to claim in the patent." 35 U.S.C. § 251.

Section 251 "is remedial in nature, based on fundamental principles of equity and fairness, and should be construed liberally.... Nonetheless, not every event or circumstance that might be labeled 'error' is correctable by reissue." *In re Weiler*, 790 F.2d 1576, 1579 (Fed.Cir.1986). As Judge Markey explained in *Weiler*, referring to the seminal decision in *U.S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp.*, 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942),[19] whether the applicant had the "intent to claim" the subject matter of the reissue claim sought is "a means of measuring whether the statutorily required *error* is present." The court went on to explicate:

> Clearly, a showing that an applicant had an intent to claim matter he did not claim can go a long way to support a finding that error occurred; and, conversely, a showing that an applicant never had any such intent makes a finding of error extremely difficult if not impossible.

790 F.2d at 1581.

The intent to claim, while not conclusive, is one factor "that sheds light upon whether the claims of the reissue application are directed to the same invention as the original patent *and the reissue would correct an inadvertent error in the original patent.*" *In re Hounsfield*, 699 F.2d 1320, 1323 (Fed.Cir.1982) (emphasis added) (quoted in *Weiler*, 790 F.2d at 1582).

Though the term "error" is to be interpreted liberally, it remains subject to the test under the pre–1952 statutes; thus error means "inadvertence, accident, or mistake." *Weiler*, 790 F.2d at 1582. And as Judge Markey observed there, "allegations [of counsel's ignorance] could be frequently made, and, if accepted as establishing error, would require the grant of reissues on anything and everything mentioned in a disclosure." *Id.* at 1583, n. 4.

■ In these cases Scripps contends that through error the applicants and their attorneys failed to include product claims in the original product-by-process patent. But neither the declarations of the inventors nor those of their attorneys say anything about having intended to make product claims. Thus, Scripps has failed to make a credible demonstration of inadvertence, accident, or mistake warranting remedial action.

The inventors simply assert the conclusion that they claimed "less than they had a right to claim" through their attorney's failure to recognize that product claims were available. Since the specifications discuss in detail the product (a Factor VIII preparation) that was the object of the product-by-process claim, the inventors were obviously aware of the Factor VIII product that is the subject matter of the reissue claims. Having been aware of the product, it is difficult to see how, if they had intended to claim it, they could have failed through inadvertence to do so when they were claiming the process. In any event, there is no evidence that that is what they intended.

Moreover, the attorney declarations and depositions belie the claim of attorney er-

---

**19.** "[I]t is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original." *U.S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp.*, 315 U.S. 668, 676, 62 S.Ct. 839, 843, 86 L.Ed. 1105 (1942).

ror. Attorney Cohen, who drafted the application, has come forward with no explanation, as required by the regulations, of how he came to omit the product claims. When his deposition was taken, he stated: "Why I didn't claim it I couldn't tell you...." (Def. App. at 115, Cohen Depo.) The assertion that he "did not appreciate that product claims per se in addition to product-by-process claims could be presented," coming from an experienced patent lawyer who drafted the application which described the Factor VIII product at length, is inherently incredible.

The Lipscomb declaration is even more incredible. Lipscomb is an experienced patent attorney, a former patent examiner, and general patent counsel for Revlon and Rorer. He is in addition the author/editor of "Lipscomb's Walker on Patents," an eleven volume treatise on patent law, and the author of supplements for "Patent Claims," a 2,400 page treatise. His assertion in the declaration that "he did not fully appreciate that claims of the type sought by reissue were possible," Def. App. at 90, Lipscomb Dec., aside from being conclusory is refuted by his treatise in which he states:

> When novelty is present in the process and the composition of matter produced thereby, the patentee may claim both the process and the product; but the patent is not restricted to the described process and covers the product, however produced.

1 Lipscomb's Walker on Patents (3d Ed. 1984) § 2:9, at 145. Testifying at his deposition, he admitted that he was aware in 1981 that product claims could be made, Def. App. at 171, 186, Lipscomb Depo., and stated

> I wouldn't say I failed to [put product claims in the original patent] ... we just didn't. For whatever reason I don't specifically recall ...

Id. at 175. At the time of the original application, he felt that the product-by-process claims adequately covered purified Factor VIII:C. Id. at 173, 174. The only reason stated by Lipscomb for adding product claims was that after the suit against

Genentech was filed, he "saw the opportunity to get other claims." Id. at 173. This does not support a finding of error.

Scripps relies on In re Wilder, 736 F.2d 1516 (Fed.Cir.1984), cert. denied, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985), approving reissue "where the attorney failed to claim the full scope of the invention in the original patent." (Reply p. 4.) Wilder is indeed instructive and demonstrates how applicants have failed to satisfy the requirements of section 251. In Wilder the patent was for a mechanism for indicating the location of particular information on a tape used in a dictating machine. The original patent claimed a device for locating information on a recording tape, an integral part of which was an array of light-emitting sources that would be activated by the electronic signals on the tape and would serve as indicators. After the device was successfully marketed, it became apparent that it could be sold without the light array specified in the original claim and that the prior art permitted the resulting broadening of the patent. All of this was explained in a lengthy and detailed declaration which demonstrated, as the court found, how and why the attorney's failure to appreciate the full scope of the invention and the state of the prior art was not discovered until the patented invention had been commercialized. Id. at 1518–19.

Scripps has offered no such evidence. And here, unlike in Wilder, the attorneys could not have failed to appreciate that the scope of the patent could include the product of the process that they claimed, and, even if they did, they have not explained how they came to discover their error.

### D. Deference to the Examiner's Decision

Scripps argues that the decision of the Examiner to reissue the patent is entitled to considerable weight.

With regard to the "claiming less" on the original patent than the inventors were entitled to, the Examiner took the following actions. In an Office Action on July 31, 1984, the Examiner rejected claims, including the product claims at issue, because

they "introduce new matter." (Ex. A 00232, Office Action ¶ 35.) He later withdrew this rejection, based in part upon the representations by the applicants about the human factor VIII product potency and purity, discussed above.

With regard to the specification of "error," the Examiner stated that the reissue oath or declaration was defective for failure to "particularly specify the errors relied upon." (Ex. A 00233, Office Action ¶ 40.) The Examiner later withdrew this rejection, relying on the applicants', Cohen's and Lipscomb's declarations, Ex. A 00396–97, the content of which is discussed above.

■ While the Examiner's decision is entitled to deference, he obviously did not have the benefit of facts revealed in subsequent discovery, and he did not adequately consider the controlling law.

E. *Deference to the PTO*

■ Scripps argues that the decision of the PTO upholding the Examiner's grant of the reissue patent is entitled to considerable weight. Specifically, it argues that the PTO "rejected defendants' arguments and ruled: 'Applicants have adequately shown that the error arose without deceptive intention. (Plaintiffs' Exhibit A–8, page 00515).'" (Reply at 5.) This argument is meritless, for while the Examiner withdrew his rejection under section 251 and 37 C.F.R. § 1.175, the present issue was not raised before the PTO. Examination of the PTO ruling shows that the "error" the PTO addressed was limited to the incorrect specification of the VIII:RP removal rate which is not contested here. (*See supra* at 1558, n. 18 and accompanying text.) The present issue, concerning applicants' originally claiming less than they were entitled to, was not addressed by the PTO.

The evidence is clear and convincing and undisputed that the inventors did not comply with the requirements of section 251. For the reasons stated, defendants are entitled to summary judgment on this defense.

## VI. CONCLUSION

Defendants' motions for summary judgment on the grounds of anticipation, inequitable conduct, and violation of the best mode requirement and section 251, are granted with respect to claims 13, 14, 17, 18, 24 through 29, and 34, and the actions are dismissed. Counsel are directed to submit proposed forms of judgment forthwith.

IT IS SO ORDERED.